S. E. McROBERTS ET AL., TRUSTEES, ETC., Respondents, v. JOHN MOUDY ET AL., TRUSTEES, ETC., Appellants.

**Kansas City Court of Appeals, October 26, 1885.**

1. REVERTER—TO WHAT INSTANCES APPLICABLE.—The doctrine of reversion applies only to the instance of a donation for a charity, and not to that of a vendor or grantor of land in fee for a valuable consideration paid. In the latter case there can never be a *reverter* of the estate to the vendor or his heirs, though the use to which it was granted should wholly fail. *Gibson v. Armstrong*, 7 B. Monroe (Ky.) 489.

2. CHARITY—DIVERSION OF NOT ALLOWABLE.—A charity given for a particular purpose cannot be altered or diverted to any other. It must be accepted and retained upon the terms upon which it was given, and no concurrence among the donees can operate to transfer or apply it to other purpose. 2 Story's Eq., sect. 1175. The cession or donation of property for church purposes, when coming from the local members and community, ordinarily, is for the object of securing worship, and religious privileges and influences at the place of such church

building. A removal of the church and the property would be defeating such intentions, and such diversion would be violative of the trust imposed by the charity.

8. BAPTIST ORGANIZATIONS—CASE ADJUDGED.—From the evidence in this case it would seem that there is no federal head to Baptist organizations. Each church society manages absolutely its affairs, temporal, spiritual and doctrinal. It is an unqualified democracy in which the majority is supreme. And this majority consists, not of the actual membership of the local body, but the bare majority that may chance to be present at any of the regular or stated meetings of the church; and this majority have the right and power to dispose of the church property. But *such usage* is limited to such property, as by the terms and quality of its tenure, is the subject of transfer and removal by the church, and could not be permitted where it would violate the terms of the grant or donation as a charity. *Held,* that *in this case* the majority had the unqualified power to disband and put an end to their church organization at that place, and exercised it, and this association thenceforth ceased to exist, and there was no power resident in the minority to revive it and appoint for it new trustees and ministerial officers.

APPEAL from Bates Circuit Court, HON. JAMES B. GANTT, Judge.

⁄ *Reversed and remanded.*

Statement of case.

This is an action of replevin for the recovery of certain property alleged to belong to a church, known as "The First Baptist church of Crescent Hill," in Bates county. The action was instituted in a justice's court, and removed, at the instance of defendants, to the circuit court on writ of *certiorari*. The material facts are that about the year 1878, a deed was made to certain trustees and their successors for a lot on which to build a church for the Baptist denomination at Crescent Hill. Money was subscribed by various parties for the purpose of erecting the church building and furnishing it for worship. The congregation worshiping in it numbered, as shown by the books, about one hundred and eight. Unhappily for the unity and harmony of the congregation, about 1880, a new town, named Adrian, sprang up on the line of the railroad, distant two and one-half miles from Crescent Hill. A Baptist

church was organized at Adrian ; and as many of the members of the Crescent Hill church had moved to Adrian, and others went there to transact business, they began the agitation of removing the former church to and becoming identified with the latter church. After one or more efforts, it resulted, that, at a church meeting held in 1881, a majority of those present voted to donate and convey the church property at Crescent Hill to the church at Adrian, and directed the trustees of the church to convey accordingly ; which they attempted to accomplish by executing a deed conveying the lot to the trustees of the Adrian church. They also succeeded in persuading the original grantor of the lot to the Crescent Hill church to make a quit-claim deed to the Adrian church. This congregational meeting also voted to disorganize and disband the Crescent Hill church.

After this action, the minority, claiming to be the Crescent Hill church, proceeded to elect new trustees, and continued to worship in the old church, maintaining a minister and a prosperous Sunday school. The defendants, claiming to be trustees of the Adrian church, and representing another religious body worshiping there, removed from the old church to the new, the property in controversy. The plaintiffs, as trustees, instituted this action to recover said property.

The circuit court found the issues for the plaintiffs, and rendered judgment accordingly. The defendants prosecute this appeal.

PARKINSON & ABERNATHY, for the appellants.

I. This church organization at Crescent Hill, prior to December 3, 1881, was a religious association of persons holding to the faith and system of church government peculiar to the Baptist church ; and organized and conducted, as the proof shows it was, constituted a Baptist church. Its action December 3 was with notice, and was duly had in strict compliance with the law and usage governing the Baptist church under which it could control and dispose of its property. _Hamblett v. Bennett_, 6 Allen

140; *Redemption Church v. Grace Church*, 68 N. Y. 570; Wood's Field on Law of Corporations, sect. 203.

II. The action of the *majority* on December 3 was in accordance with Baptist law and custom in the disposition of church property; and the subsequent action of the *minority* is contrary to such law and usage. And in determining questions of property, the courts will look only to the action of the church, and if found to be in accordance with its laws and customs, and not in contravention of its original purpose and design, nor of " the law of the land," that action will be regarded by the courts as final and conclusive. *State ex rel., etc., v. Farris*, 45 Mo. 483; *North St. Louis Christian Church v. McGowan*, 62 Mo. 279; *Gibson v. Armstrong*, 7 B. Monroe 281; *McGinnis v. Watson*, 41 Pa. St. Rep. 9.

III. The church membership, acting under its forms and with the sanction of their " association," is the governing power in Baptist church control, and it exercises that power on the democratic principle, that the "majority shall rule." The vote taken on December 3, was a direction to their trustees to convey the church building, and the execution of the deed in pursuance of such direction, vested the property in the trustees of the Adrian church. There is no property or right of property, or right of possession in the minority at Crescent Hill, and none in the plaintiffs as the trustees of that minority; and no such right of action as has been invoked exists in favor of either the minority or their trustees. *Roshi's App.*, 69 Pa. St. Rep. 462; *Brown v. Monroe*, 80 Ky. 443.

IV. The evidence of Baptist law and usage, and the relations between churches in regular standing with the " Butler Association," and the disciplinary powers of the association over irregular action, as introduced, is competent, and the subsequent action had by the association, set forth in the motion for a new trial, is relevant and sufficient to authorize a new trial. *Roshi's Appeal, supra; Bird v. St. Mark's Church*, 4 Am. and Eng. Corp. cases 120.

JOHN T. SMITH, for the respondents.

I.   Trustees of a religious society, in the absence of an express or clearly implied trust, hold the property for the use of the *particular* society of which they are trustees, and not for any church in general, or for the benefit of any peculiar doctrines, or practice in religious matters.   6 Cent. Law Journal, 97 ; *Calkens v. Cheney*, Sup. Ct. Ills.   Then the title to the church lot, involved in this case, was held in trust, not for the Baptists as a denomination, but as a congregation at Crescent Hill, and when there ceased to be such a congregation the property would revert to the original donor.

II.   Can the majority of a religious congregation, without an order of court or some enabling statute, by vote of a majority, convey the property and close up the existence of the congregation?   It can do none of these things.   As to the *first* proposition see *Madison Avenue Church v. The Baptist Church*, 46 N. Y. 131 ; *Ib.*, 73 N. Y. 82. As to the *latter* proposition see *Wheaton v. Gates*, 18 N. Y. 39 ;   *Venable v. Coffman*, 2 W. Va. 310.

III.   The subscribers to the building fund of said church were bound, legally, by their contract to pay said subscriptions ; and the trustees were equally bound to execute their trust in good faith.   *Baker et al. v. Thales*, 9 Pickering 488.

IV.   The case in 45 Mo. 183, and other authorities cited to support appellant's theory that a majority of the members could convey the church property in controversy, do not apply to the case at bar, nor do they, indeed, touch any points raised in the case.   The general doctrine in this country, is that the decisions of ecclesiastical courts are binding on the law courts, only when done in fairness and good faith.   In this case the proceedings were not of this character, for at the regular meeting the proposition to convey the church was lost ; but they waited until they got a majority at the meeting and then voted the church away and disbanded the congregation on December 3.

The law will not countenance such unfair conduct on the part of those leaving the church at Crescent Hill.

PHILIPS, P. J.   I.—This cause is argued here much as if the question to be determined involved the title to the lot and church building.   If this were the issue it would be enough to say that, under the constitution creating this court, we have no jurisdiction to determine a controversy involving the title to real estate.   But it appears that the deeds conveying this property to the Adrian church only purport to convey the lot on which the old church stands, which, if effectual, would of course convey the church building as an appurtenant.  But this controversy is as to the right of custody and possession of certain property contained and used in the old church, and regarded by the parties as mere personalty.   As such it did not pass under the deeds.

II.   It is also a misapprehension of the law to assume, as the defendants did in taking a quit-claim deed from the original grantor, that if the Crescent Hill church was dissolved and disbanded by the action of the majority, the lot and church reverted to the grantor.   The doctrine of reversion applies only to the instance of a donation for a charity, and not to that of a vendor or grantor of land in fee for a valuable consideration paid.   In the latter case there can never be a reverter of the estate to the vendor or his heirs, though the use to which it was granted should wholly fail.   *Gibson v. Armstrong*, 7 B. Mon. 489, 490. The deed conveying the lot to the old church trustees expresses solely a money consideration.

III.   It is inferable from this record, and the subscription paper read in evidence by plaintiffs, that the purpose and design in the erection and furnishing of the Crescent Hill church, was to have a church at this particular locality, for the use and benefit of the Baptists worshiping at that place, and for other religious denominations when not in use by the Baptists.   This in fact the subscription paper declared.   The money and property were so received by this congregation with an implied promise to so

use and apply it perpetually. What authority then had
a majority of the constituent members of the Baptist
association to wholly divert its use by voting it away to
other people at a different place? We know of no au-
thority in law for such diversion and misuser, and are
unwilling to believe that any law, usage or custom of any
ecclesiastical organization could subvert this principle
of right and justice. A charity given for a particular
purpose cannot be altered or diverted to any other. It
must be accepted and retained upon the same terms upon
which it was given, and no concurrence among the donees
can operate to transfer or apply it to other purpose. 2
Story Eq., sect. 1175; *Venable et al. v. Coffman*, 2 W.
Va. 320; *Brown et al. v. Moore et al.*, 80 Ky. 443.

The cession or donation of property for church pur-
poses, when coming from the local members and commu-
nity, ordinarily, is for the object of securing worship and
religious privileges and influences at the place of such
church building. As Ch. J. Parker, in *Baker v. Fales,
supra*, p. 506–7, says: "The place in which the church is
located, is generally had in view by the donor, either
because he had there enjoyed the preaching of the gos-
pel and the ordinances, or because it was the place where
his ancestors or family and friends had assembled to-
gether for religious purposes. These associations will be
found to be the leading motive for the particular direc-
tion which his charity has received. If he gives to a
church for the general purpose of promoting piety, or
for the use of the poor of the church, he generally des-
ignates the body by the place where it is accustomed to
worship. * * * It must be supposed that the donor had
in view the society of christians worshiping in those
places; and as his donation is intended to be perpetual,
that he had regard to the welfare of successive gener-
ations, who might become church members and worship-
ing christians in the same place. If the whole society
should find occasion to remove to some other place in
the same town, the identity might be preserved, and the
bounty enjoyed as he intended it. But if the church

alone should withdraw, and unite itself to some other church, or to a new and different congregation, it would be defeating his intentions to carry the property with them, and distribute the proceeds in a community for the members of which he may never have entertained any particular feelings of kindness." He then proceeds to declare that such a diversion would be violative of the trust imposed by the charity.

Learned counsel cite, as pertinent to this controversy, the cases of *Gibson v. Armstrong* (7 B. Mon. 381); *McGinnis v. Watson* (41 Pa. St. 9); *Roshi's Appeal* (69 Pa. St. 462); *State ex rel. Watson v. Farris* (45 Mo. 183); and *North St. Louis Chr. Church v. McGowan* (62 Mo. 279). We hold that these cases, and kindred authorities, are not pertinent to the facts of this case. In the first place they did not involve the question of the right of removal from the given locality of church property after it had been donated under circumstances like these at bar. They involved principally the question as to which of two disagreeing factions of a local church was entitled to hold and use the church property. And further, they were instances where the contending denomination was in connection with, and a constituent part of, an ecclesiastical organization, like that of the Episcopal Methodist, or Presbyterian, which have a federal head, invested by their constitution, or recognized usage, with supervisory and supreme control over the constituent parts, to determine all questions of a temporal, spiritual, or doctrinal character producing schisms and divisions among the local members, and to decide which faction is in the right, and to recognize the one or the other as the proper organization. In such cases it is the well settled law of the civil courts that "the title to the church property of a divided congregation is in that part of it which is acting in harmony with its own law, and the ecclesiastical laws, usages, customs, and principles which were accepted among them before the dispute began, are the standards for determining which party is

right." It is the duty of the court in such cases to decide in favor of the faction, whether a majority or a minority of the particular congregation, who adhere to the doctrines maintained by the congregation, "as also in favor of the government of the church in operation, with which it was connected at the time the trust was declared." *Roshi's Appeal supra*, p. 468, and authorities cited.

This leads us to a consideration of the character of church government among the Baptists. Looking to the evidence preserved in this record, the only light we have on this matter is the testimony of witnesses introduced by the defendants. From this it would seem that there is no federal head to Baptist organizations. What function Baptist Associations perform, or what jurisdiction they exercise, is not disclosed. The evidence tends to prove that each church society manages absolutely its affairs, temporal, spiritual, and doctrinal. It is an unqualified democracy, in which the majority is supreme. And this majority, according to this testimony, consists, not of the actual membership of the local body, but the bare majority that may chance to be present at any of the regular or stated meetings of the church. Some of these witnesses stated that this majority have the right and power to dispose of the church property. This statement is so sweeping that it is indefinite. It must be received, *ex necessitate rei*, with the legal qualification that such usage or rule should be limited to such property, as by the terms and quality of its tenure, is the subject of transfer and removal by the church. No such regulation or usage could be permitted by the courts, where it would violate the terms of the grant or donation as a charity. We are decidedly of opinion that the removal of this property from Crescent Hill to Adrian was a perversion of the charity, and was wrong in law and equity.

IV. The more embarrassing question for determination is, the right or capacity of these plaintiffs to maintain this action. If the defendant's evidence, in this connec-

tion, is to be credited, and that is a question for the triers of the fact, the majority of the members present at a stated meeting of this church, according to the system of government and mode of procedure recognized and prevailing in the ecclesiastical polity of the Baptist denomination, had the unqualified power to disband and put an end to that church organization at that place. Nor did the plaintiff, by any counter proof, contravert this position. If this be true, this association at Crescent Hill, upon the announcement of the majority vote, thenceforth ceased to exist. How then could the minority fragment of the defunct organization subsequently meet and elect new trustees, as was attempted in this case? The minority might meet and reorganize as a new church association, as Baptists, but it would succeed to none of the rights or incidents of the old organization. There was no power resident in this minority to resuscitate and revive the dead, and appoint for it new trustees and ministerial officers.

We are referred by counsel to the valuable opinion of Chief Justice Parker in *Baker v. Fales, supra.* It is true it is there held, that where a majority of the members of the Congregational church separate from a majority of the parish, the members who remain, although a minority, constitute the church in such parish; are entitled to hold the church property, and may maintain replevin therefor through trustees selected by the minority. But a careful reading of that opinion, and others in Massachusetts following the precedent, show that the ruling is made to depend mainly on the peculiar history and usages of the parish organizations in respect of this religious denomination in the New England states, as well as certain legislation relating thereto. While, as the name indicates, those churches are, in a measure, independent associations, yet in that state, from time immemorial, they are so allied to and interwoven into the parish system as to be regarded as a part of the parish; so that, in the absence of some plain provision in the terms of the grant or donation for the church, usage and custom re-

garded it to be for the benefit of the whole parish. And then it had been the custom and usage of the parish to have to do with the selection of the minister allotted to the congregations. So when the minister selected for this particular congregation had the sanction of the parish, though he was distasteful to the majority of the congregation, who withdrew on that account, it was held, in accordance with the rule already adverted to, that the parish majority controlled in respect of this controversy, and the minority, acting in harmony with the ecclesiastical law, usage, and principles, accepted among them before any dispute began, constituted the entity and preserved the identity of the congregation, and was, therefore, entitled to the church property.

So it is said by the court in *Venable v. Coffman* (2 W. Va. 320), "that an organized church cannot be divested of its property by even a majority of its members, who enter into a new organization, although they adopt the same name, provided the old organizatian still exists ; and that when seceders from an organized church enter into such new organization, they forfeit all claims to any interest in the former church, and lose all identity with it." But the trouble with the plaintiff's cause is, that the old organization at Crescent Hill had ceased to exist. It was, according to the ecclesiastical law prevailing in its system of government, disbanded and disrupted as an organization. It stood allied to no parish system, nor was subject to any higher ecclesiastical court. Its act of dissolution was in harmony with the usage and law of the church before the dispute begun.

It must follow that the plaintiffs, crediting defendants' evidence, were without capacity to sue ; and the court erred in refusing so much of defendants' instructions, based on the evidence, as presented this issue.

What remedy, if any, the minority have against this spoliation and diversion of trust property, we are not called upon to determine. If it exists anywhere it is in the courts of equity, unless plaintiffs develop a different

state of facts as to the majority vote disbanding the organization.

The judgment of the circuit court must be reversed, and the cause remanded for further proceeding in conformity herewith.   All concur.