### J. S. JARRELL ET AL. v. T. J. SPROLES ET AL.

Decided February 2, 1899.

1. **Religious Societies—Division—Control of Property.**

The decision of an association, convention, or council of Baptist churches, the government of which is purely congregational, that certain doctrines adhered to by a majority of the church are contrary to the doctrines of the Baptist Church, is not conclusive so far as affects the rights of the majority of the church to control its property, since such associations, conventions, and councils are mere voluntary and advisory judicatories.

2. **Same—Majority Rule.**

Where the principle of church government is that of the majority rule, the numerical majority of members must control the right to the use of the church property.

APPEAL from Austin. Tried below before Hon. H. TEICHMULLER.

*Scarborough & Scarborough,* for appellants.

*Bell & Shelburn* and *Davidson, Minor & Hawkins,* for appellees.

WILLIAMS, ASSOCIATE JUSTICE.—The following statement from brief of appellant will sufficiently indicate the character of the action and of the judgment from which the appeal is taken:

This cause was brought into the District Court by plaintiffs, J. S. Jarrell and J. A. Wallace, deacons of the Wallis Baptist Church, alleging the organization of the church in 1885, on the articles of faith and covenants usual among Baptist churches, as published in "Pendleton's Manual;" the election by said church of plaintiffs as deacons; the conveyance to them, and their successors in office, of the property in question, as deacons of the Wallis Baptist Church; that they still held the

office, and were acting in such capacity; the erection of the church build-
ing by said church on the lot, and the continued and peaceful use of the
same as a place of worship until 1886, when dissension arose over a
heresy, known as "Martinism," which caused a division in the church,
which is fully explained in the findings of fact. Plaintiff alleged ouster
by the defendant majority faction, and that said majority faction had
abandoned the doctrines of Baptist churches, and had gone into "Martin-
ism," and were diverting the property from the purposes for which it was
dedicated. They further allege that when the doctrinal difference arose,
in accordance with the organic law, custom, and usage of the Baptist
church, and in accordance with the covenant in the constitution of the
Union Association, they requested a council of the sister churches to
meet and pass on the differences and reach an adjustment of the diffi-
culties; that the council did meet, and after a full hearing did decide that
plaintiff minority were the true Wallis Baptist Church, and that the de-
fendant majority had gone into "Martinism" and were no longer Bap-
tists. That plaintiff minority had been recognized by the Union Asso-
ciation and the Baptist General Convention of Texas as the Wallis Bap-
tist Church, of which the Wallis Church was a member prior to the dis-
sension, and was received as a member in both of said bodies.

They prayed for an injunction, the possession and title of the property
for the purposes of the trust. The injunction was granted to the extent
that each faction was permitted to use the church house one-half of the
time.

Defendants answered by general and special exceptions, denial, not
guilty, and specially answered that they are the Wallis Baptist Church;
they deny any departure from true Baptist doctrine; assert that the plain-
tiffs are excluded members of the Wallis Baptist Church, seceders, and
allege the independent sovereignty of the church in all matters, and deny
the authority of councils to in any manner pass upon or adjudicate mat-
ters of difference between members of the church, and assert their right
to the property in controversy as the true Wallis Baptist Church.

On hearing, the injunction was dissolved and judgment rendered for
defendants, from which said judgment the plaintiffs now prosecute their
appeal to this court.

There is no statement of facts showing the evidence adduced upon the
trial, and the appeal is submitted upon the findings of the trial judge,
which are as follows:

"(1)   On the 13th day of May, 1891, a deed of conveyance was exe-
cuted by the Gulf, Colorado & Santa Fe Railway Company conveying to
J. S. Jarrell and J. A. Wallace, as deacons of the Wallis Baptist Church,
and their successors in office, the lots in controversy. Said church had
been organized in 1885. A church building was erected on said lots, and
the members of the organization were united, and used the property for
worshiping purpose until division occurred among them, occasioning
this pending litigation, as follows:

"(2)   On the 11th day of October, 1895, a Baptist General Conven-

tion, held at Belton, Texas, adopted several resolutions, to the effect that this body—the 'convention'—is the only competent authority of determining its membership, and that no one be recognized as a member who believed what is known as 'Martinism,' and who thereby abandons the declaration of principles of all Baptist churches.

"Mr. C. T. Sanders, pastor of the Sealy and also of the 'Wallis Baptist Church,' and attending said convention as a messenger of the Sealy Church, withdrew from the same by reason of the adoption of the said resolution, on the ground, as he testifies, that by the adoption of said resolutions the convention transcended its authority and encroached upon the sovereign independence of the several churches.

"Soon after this, the Wallis Baptist Church, by a majority of its members, passed resolutions indorsing the course pursued by Mr. Sanders in withdrawing from said convention. Some time after the adoption of this resolution, the minority framed a declaration to the effect that the majority had thereby indorsed 'Martinism" and departed from the true Baptist faith; that they could no longer affiliate with them; and they set themselves up as the true Wallis Baptist Church. Subsequently the majority at a regular meeting excluded or expelled the members constituting the minority from their church organization, and each of these two factions claimed to be the only legitimate 'Wallis Baptist Church.' Members of the majority who were appointed to counsel with the seceding members and to effect a reconciliation to restore harmony, if practicable, assured them that it was not the purpose of the resolution in indorsing the conduct of Mr. Sanders to commit the church to 'Martinism,' but to protect the sovereignty of their church; but their efforts proved fruitless.

"(3)    On the 7th day of July, 1896, a council met at Wallis, at the instance of said minority faction, to consider the pending controversy. This council, after an ex parte investigation, sustained the position of the minority faction and decided that it constituted the 'original and regular Baptist Church of Wallis.' This decision, however, was ignored by the majority, and this suit is instituted by the minority to recover the church property in controversy.

"(4)    All parol and written or printed evidence coincided substantially in establishing the organization or government of Baptist churches, viz: Section 2 of article 1 of the constitution of 'The Baptist General Convention' provides: 'Section 2. The object of this convention shall be missionary and educational, the promotion of harmony of feeling and concert of action among Baptists, and a system of operative measures for the promotion of the interest of the Redeemer's kingdom, but no individual enterprise shall be formally entertained or acted on by this convention.'

"Section 1 of article 2 provides: 'This body shall be composed of messengers from regular Baptist churches and associations of Baptist churches, and Baptist missionary societies, co-operating with the convention.'

"Section 2 of article 3 provides: 'The convention does not have and

shall never attempt to exercise a single attribute of power or authority over any church, but cheerfully recognizes the absolute sovereignty of the churches.'

" 'Pendleton's Church Manual,' recognized as authority by Baptists, says in reference to the 'province of associations and councils' as follows, page 172: 'Every church acts voluntarily in connecting itself with an association. There is not, there can not be, compulsion in the matter. This results from the fact that the scriptures recognize no higher tribunal than a church. Again, it follows, of necessity that an association is only an advisory body. It may recommend to the churches that they do thus and thus, but it can go no further. It can enact no decrees, and if it did, it would have no power to execute them. It is no court of appeals, whose decisions are to nullify those of the churches. Baptists must, with holy jealousy, watch and arrest the first encroachments of associations on the independence of churches.'

"In regard to 'councils' it says: 'Like associations, they are advisory bodies, and while this fact is kept distinctly in view, their utility can not be questioned; but there is danger lest they assume authority over the churches, and lest the churches acquiesce in the assumption. Again, in cases where the aid of a council is sought, the right of a decision rests with the church. It is the province of the council not to act authoritatively, but to advise churches how to act. This advice, so given, ought by no means to be lightly rejected; but if, in the deliberative judgment of the church, it is contrary to the will of the Master, it can not be adopted. When a disagreement of this kind arises, perhaps the most effective means of restoring harmony may be to have recourse to a second council,—still, the ultimate decision belongs to the church. Again, as councils are advisory, they are not authoritative bodies, hence for a council to require a church to give a pledge beforehand to abide by its decision is a direct assault on church independence, and for a church to give such a pledge is disloyal to Christ, for it is a surrender of the great principle,—a church is the tribunal and is the only competent authority to pronounce a final decision.'

"(5)  Since the controversy arose the members of the majority of the Wallis church have appointed new deacons as successors of the deacons to whom the property was originally conveyed in trust.

"(6)  The evidence tends to show that Mr. C. T. Sanders believes in some of the views designated as 'Martinism;' that members of the Wallis Baptist Church concur in these views, and that the doctrines stigmatized as 'Martinism' by those who claim to represent the regular Baptist church, agitate the Baptist fraternity of Texas considerably, producing dissensions and discord of a serious character.

"Addition to first finding: The organization of Wallis church was but a reorganization of the New Providence church, which was organized upon articles of faith common among Baptist churches.

"Addition to second finding: Mr. Sanders withdrew from the convention because it had, by the passage of the resolution, transcended its

power and encroached upon the sovereignty of churches by condemning the Bible doctrine of assurance. The minority faction, from the time they declared nonaffiliation with the majority, continued their organization as a church, maintained worship, and called a pastor to preach to them.

"The ground of the exclusion of the minority faction by the majority faction was that they refused to become reconciled to the action of the majority in passing resolutions indorsing Elder Sanders' withdrawal from the convention.

"Addition to third finding: The minority faction requested the majority to·join in a call for a council. The majority declined. Some of the majority were present during the sessions of the council, and answered some questions, but refused to take part, and refused to let the council have the church records. The council decided the minority to be the true Wallis Baptist Church, and that the majority had gone into 'Martinism.' This council was composed of ministers and deacons from sister churches in the Union Association. .

"Addition to fourth finding: I further find that since the organization of the Wallis Baptist Church it has belonged to the Union Association, a local body composed of Baptist churches in several adjoining counties, with constitution very similar to the General State Convention, this association being of the class recognized in the constitution of the general convention, as 'an association of Baptist churches.' The constitution of the Union Association, among other things, contained a provision that, should a difference in doctrine or faith arise in any church a member thereof, 'that the matter should be adjusted by a council composed of ministers and deacons of sister churches in this body.' But this provision, interpreted in the light of the whole constitution, gives no greater power to a council than that of an advisory body, and recognizes the soverign supremacy of the church.

"I further find that since this division has arisen the minority church has been regularly received as a member of the Union Association, each year, and has also been received and recognized last year by the general convention as the Wallis Baptist Church; that the majority faction has made no effort to seek recognition in these bodies since the division; that the Union Association held its session in 1896 with the minority church at Wallis. It also appears from the text books that the connection of the churches with these conventions and associations is entirely voluntary.

"I further find that the Sealy and Buckholtz churches, of which Elder Sanders is pastor, have been dropped from the Union Association because they have passed resolutions condemning councils, associations, etc., and because they have gone into 'Martinism,' but not as showing the status of the Wallis Church.

"Addition to the fifth finding: I find defendant Sproles duly elected deacon in the Wallis Baptist Church prior to the division and upon the expulsion of J. S. Jarrell for causes disconnected with this controversy,

and that since the filing of this suit, the majority has elected another deacon, P. Bland, the record containing no evidence of successorship. That T. J. Sproles and P. Bland are now deacons of the majority church, and plaintiffs J. A. Jarrell and J. A. Wallace are deacons of the minority church.

"Conclusions of Law.—(1)    By reason of the fact that, in America, the state and church are absolutely separated, it is well settled, on principle and by many precedents, that civil courts will not disturb the decisions of competent church tribunals as to all matters within their jurisdiction.    Members of churches voluntarily subject their rights involved, in church affairs, to the decision of tribunals that may be instituted by organized churches for their government.    Civil courts must respect such decisions as final, if they do not violate the law of the land as to rights of person or property.

"(2)    But it is also well settled that trustees who hold property for the benefit of church organizations are subject to the control of courts of equity, in order to prevent the diversion of such trusts, to purposes incompatible with the purposes for which the trusts were created.

"(3)    It is contended for the plaintiff that the decision of the council in their favor entitles them to recover in this suit.    They invoke the principle that churches and individuals surrender part of their sovereign rights by becoming members of the Baptist Church; that the long established principles of submitting disputes to councils and of accepting their decision as final makes such council a competent church tribunal, which the courts should recognize.    It is also contended that there must be, as matter of necessity, some supreme authority of the Baptist denomination, authorized conclusively to decide and settle controversies of a doctrinal or ecclesiastical character, or else disorganization is inevitable.    Many church organizations have acted upon this principle and established a well-defined government of their internal affairs, including creeds and questions of faith.    This, however, is a matter of church polity, which the Baptists have unequivocally repudiated.    Baptists manifestly assert absolute sovereignty of every church organization; discarding all human authority and recognizing  Jesus Christ as their only Master, and His gospel as the sole source of light, they trust implicitly to His spiritual force to guide the conscience of all members of the Baptist denomination.    It can not be a legitimate function of State government, which is to be neutral in all matters of church and religion, to force upon Baptists a government of their individual affairs in conflict with their cardinal doctrines.    Members of Baptist churches have not surrendered any of their rights to the control of associations or councils, either expressly or impliedly, but have accepted them only as advisory bodies, reserving to the church the ultimate right of decision.

It is also to be noticed that the action of the council in question was based upon an ex parte proceeding, and could not be binding upon a party which had no hearing.    Hence it is the conclusion of the court that the decision of the council and the action of the Belton convention, or any

Baptist association, however persuasive it may be, are not of binding force upon the Wallis Baptist Church.

"(4)    It remains, however, to be determined whether the action of the Wallis Baptist Church is heretical, and diverts the property in controversy to purposes antagonistic to the purposes of the created trust. If it were incumbent upon the court to decide whether what is termed as 'Martinism' is heretical or not, it would be inclined to regard the doctrinal disputation provoked as involving theological subleties, characteristic of mediaeval scholasticism, rather than as vital and essential questions of christianity. But it is not necessary to pass upon this question, for the evidence does not show that the Wallis Baptist Church as an organization adopts and follows what is termed and designated as 'Martinism.'

"The members of the Wallis Baptist Church and their pastor have only obeyed solemn injunctions to watch and arrest with holy jealousy the first encroachment of associations on the independence of their church. Their action, as shown by the evidence, evinces determined loyalty to the cardinal principles of Baptists, to protect the freedom of individual conscience, and the sovereign supremacy of their local churches.

"It is further asked by plaintiffs, if they are not held to be the true Wallis Baptist Church, that the injunction be perpetuated, giving them an equal right of using and enjoying the property in dispute. To this it can only be replied, that the court has no right to decree compromises of legal controversies of litigants. It is to be regretted that members of churches suffer their doctrinal zeal, however sincere it may be, to carry them so far as to appeal to the civil courts to decide their internal dissensions and to prejudice the great cause to the service of which they are devoted by exposing intolerant and factious disputes and strife to the criticism of general public opinion. This is, however, their right, but it is the plain duty of the court to settle the controversy, so far as it involves legal rights.

"From what is said it follows, that the judgment determines, first, that the injunction is dissolved; second, that the defendants are legally recognized as the true Wallis Baptist Church; third, that the title of the property vest in the deacons or trustees selected by defendants, for the exclusive benefit and enjoyment of the members of the Wallis Baptist church, as the beneficiaries."

*Opinion.*—Beyond the facts stated in the judge's findings, there is before us no evidence that the majority faction of this church had embraced "Martinism," and none that the belief expressed by that terms is inconsistent with the true faith.

The judge's finding is, that the evidence failed to show that the majority had gone into "Martinism," and we have not the evidence before us to enable us to determine whether or not this was a proper deduction to be drawn from it, unless it be true that the actions of the council, convention, and association are to be taken as conclusive upon that point.

The same observation is to be made as to the character of the doctrines

or dogmas which may be implied in the use of the term "Martinism." If it were conceded that the majority had adopted them, there is no evidence to show us what those doctrines or dogmas are, and wherein consists their divergence from the true doctrine of the church, unless the actions of the bodies referred to are to be considered sufficient upon this point also.

It is contended, it is true, that the actions taken by the minister and the majority, as set out in the findings of fact, necessitate the conclusion that they had gone into "Martinism." This is not a necessary conclusion from those acts. If they would warrant such a conclusion when explained, we should still have to presume, in favor of the correctness of the finding of the court below, that such explanation was furnished by other evidence. But should we conclude that the fact of the adoption of this belief was established, there is still an absence of evidence to show what it is, and that the indulgence of it is a departure from the fundamental tenets of this church, unless we must accept the decisions of the council and the actions of the convention and the association as binding upon the church, and therefore upon the courts, it not being pretended that "Martinism" has gained such historical notoriety or prominence as to require the court to take judicial notice of it.

The decision of the case therefore depends upon the effect to be given to the actions of the named bodies, and that point was also, we think, correctly disposed of by the court below.

The government of Baptist churches is, as we understand, purely congregational, wherein the majority vote of the church controls. It has its associations and conventions, voluntarily formed for certain purposes, but these are not empowered and do not assume to exercise authority over the actions of the churches. Councils are constituted for purposes purely advisory, to aid by their advice and counsel, perhaps, in bringing about settlements and reconciliations when dissensions arise, but their decisions are not binding on the churches. The associations and conventions have the right to determine their own membership, and this is all they assumed in this instance to do. They are shown not to have any power, under the organization of the church, to bind the actions or consciences of the churches and their members. None of these bodies, therefore, fall within the class of church judicatories, such as are provided in the organization of the churches of some of the denominations, to finally and authoritatively settle such disputes, and the decisions of which on questions of theology and ecclesiastical government are received as binding by the civil courts. The theory upon which the decisions of such judicatories are held to be binding upon members of the denomination, and upon courts when passing upon rights of property dependent upon questions which such bodies are invested with authority to decide, is thus stated by Justice Miller of the Supreme Court of the United States: "But in cases of this character, we are bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control,

and is bound by its orders and judgments. There are in the Presbyterian system of ecclesiastical government in regular succession, the presbytery over the session or local church, the synod over the presbytery, and the general assembly over all. These are called, in the language of the church organs, "judicatories," and they entertain appeals from the decisions of those below and prescribe corrective measures in other cases." Watson v. Jones, 30 U. S., 679.

The contrast between this system of church government and that existing where local churches are organized as separate and independent congregations and not as members of a comprehensive and controlling organization, is illustrated by a preceding passage in the same opinion: "In such cases (in Congregational churches), where there is a schism which leads to a separation into distinct and conflicting bodies, the rights of such bodies to use the property must be determined by the ordinary principles which govern voluntary associations. If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property. * * * The minority, in choosing to separate themselves into a distinct body and refusing to recognize the authority of the governing body, can claim no rights in the property from the fact that they had once been members of the church or congregation."

These last remarks are obiter dicta, it is true, inasmuch as they are made with reference to a case of a character not then before the court, but they are sustained by the authorities referred to, and are used by us, being a clear, comprehensive classification and differentiation of the various kinds of controversies involving the control of church property which have come before the courts, and the differing rules of decision applicable to each.

For the same reason, that in the associated form of church government, where each church is a member of a larger organization which has its tribunals for the settlement of disputes, the local churches and their members are held bound by the decisions thereof in the civil courts, the members of congregations organized independently of any larger organization are held bound by the decisions of such congregation. The reason is that, in each instance, the ultimate authority to which the member has submitted himself has spoken, and the necessary consequence is that in matters affecting the use and control of the church property, when they come in question in the courts, such decision is held binding. Shannon v. Frost, 3 B. Mon., 253.

It results from these propositions that the decision of the council and the actions of the association and convention were not binding on the Wallis church.

In the case of Bouldin v. Alexander, 15 Wallace, 131, such bodies in the Baptist church were expressly held not to be judicatories whose decisions were binding. Indeed, the association and convention only undertook to determine their own membership, which they undoubtedly had the authority to do; and the council doubtless pronounced its decisions as ad-

visory to this church for the purpose of bringing about an adjustment of the differences. But the voice of neither was binding upon the church in any such sense at to conclusively determine the points in issue affecting the right to control its internal affairs and its property.

The legal title to the property was vested in the deacons, in trust for the use of the church, and under the principle stated the majority, in case of division, had the right to control the use of it.

Whether or not, in a case like this, where the deed under which the property is held has not specified any particular creed or form of belief to be observed or taught in the church, but has merely named the denomination, a court of equity should examine into the professed belief, doctrines, or practices of those controlling the property for the purpose of ascertaining whether or not they are in accord with the essential doctrines, beliefs, and practices prevailing among churches of such denominations, and thereupon wrest from the majority and vest in the minority control of such property, we are not called upon to determine.

The court below did make the inquiry, and found that there was no adoption of "Martinism." We have no evidence upon which to review his action, except the decision of the council, and that, as we have seen, is not binding on the appellees, who constitute the majority of the church and who are therefore confessedly entitled to control the property at least until they have been shown to have ceased to constitute the church by departing from its fundamental faith. Whether or not it would be a legitimate exercise of equity jurisdiction to undertake the determination of the question as to which of two factions were true to such faith is a question which the facts do not make it proper for us to consider.

*Affirmed.*

Writ of error refused.