## W. M. CANNON et al. v. ARTHUR HICKMAN et al.

Middle Section.	February 19, 1927.

Petition for Certiorari denied by Supreme Court.	June 11, 1927.

1. Religious societies.	Civil court will inquire into questions of church rules and ordinances only when property rights are involved.

It is only where property rights are involved that the civil courts will inquire into questions of the administration of rules and ordinances and the like, where the ecclesiastical body acting or undertaking to do so, is clothed with the power and jurisdiction to act in the matter.

2. Religious societies.	No jurisdiction of civil court over member when civil rights are not invaded.

When a person becomes a member of a church he becomes so upon submission to its ecclesiastical jurisdiction, and however much he may be dissatisfied with the exercise of that jurisdiction he has no right to invoke the supervisory power of a civil court so long as none of his civil rights are invaded.

3. Religious societies.	Evidence.	Evidence held not to show a cause of action for a civil court to pass upon.

In an action by one set of deacons and a pastor to recover church property from another set of deacons and pastor, each claiming that they were lawfully elected, held that since this was a matter purely for the church and one which could be determined within its body, the civil court would not take jurisdiction and interfere with the action of the religious body.

4. **Appeal and error.** A correct judgment or decree will not be disturbed although it may have been arrived at by a mistaken process or an erroneous method of reasoning.

On appeal the court looks only to the correctness of the judgment or decree and not at the method by which the lower court formed its conclusions, hence if the judgment or decree is correct, it will not be disturbed, although arrived at by a mistaken process.

5. **Costs.** Chancellor may apportion costs among the parties.

In an equity case it lies within the discretion of the Chancellor to apportion the costs.

Appeal from Chancery Court, Lincoln County; Hon. Thomas B. Lytle, Chancellor.

Affirmed.

Giles L. Evans, of Nashville, for appellants.

Lamb & Lamb, of Fayetteville, for appellees.

DeWITT, J.   The record in this cause presents a conflict over the custody of church property between opposing claimants to the office of deacon, or trustee, in the congregation known as the Primitive Baptist Church, colored, of Fayetteville, Tennessee.

The property in question was conveyed in 1873 to Michael Stone and Alfred Johnson, as deacons of the Primitive Baptist Church, colored, of Fayetteville, Tennessee, and their successors in office— it being a lot of land on which is situated the house of worship, which has during the intervening years been used by said congregation.

The bill was filed on December 22, 1921, by Will Cannon, Clemons Maston and Martin Finch, individually, and as deacons of said church, and nine other members, including D. D. Word, an elder and former pastor, against Arthur Hickman, Charles Wright, Bob McDonald, who were claiming to be deacons, and Nathan Conger, claiming to be the pastor and moderator of said congregation.   The real contest is between the two sets of claimants to the office of deacon, and the two claimants to the position of pastor and moderator.   Thus, the congregation was and is divided into two factions, but it is of primary importance to determine whether or not any rights in the church property are involved, that is, civil rights, over which the courts will take jurisdiction.   If no such rights are involved the solution of the questions here presented is quite free from difficulty.

In their bill the complainants Will Cannon, Martin Finch and Clemons Maston claimed that they were the duly ordained and acting deacons of the church, and that therefore, they were the proper custodians and keepers of the church property; that the defendants and others allied with them conspired to oust and remove complainants in an illegal and improper way; that the defendants had locked the church building, keeping the keys unto themselves, and excluding complainants from attending the church services, or participating in the meetings or conferences of the

church members, or worshipping as members of said church; except that they come in with the defendants and those allied with them and recognize the defendants as officers of said church, and sanction and recognize the attempted exclusion and ouster of the complainant deacons and pastor.

The defendants in their answer denied that complainants were the proper custodians and keepers of the church property. They denied that they excluded the complainants, or those allied with them from worshipping in the church. They averred that on the other hand they were exceedingly anxious that the entire membership of the church continue to worship therein. They averred that they, and the majority of the membership of the church, opposed the absolute surrender of the property to the small minority of the membership of the church at their dictation, and in violation of the rules, regulations and fundamental law of the church. They admitted that the defendant Hickman did procure a night lock and placed the same on the door of the church building, and that this was done for the reason that, notwithstanding that the complainant Word, the former pastor had voluntarily, when he resigned as pastor, surrendered the keys of the church, nevertheless the locks to which said keys were fitted did not prevent parties from entering the church, and the reason for the use of the night lock grew out of the taking of some of the church property by marauders.

While it is evident that there are two factions in the congregation, each under the leadership of claimants to the offices of pastor and deacon, there is no evidence that either party has sought to excommunicate any one from membership, or charges that the other party has departed from the religious faith to the propagation of which the church property was acquired and dedicated. Each party appears to be adhering to the doctrines and religious practices of the Primitive Baptist Church. Neither party is really claiming that the other has separated itself from the membership of the church, and the issue is not between two rival parties as to which constitutes the true membership of the Primitive Baptist Church, colored, of Fayetteville. Each party is simply claiming that the real, lawful pastor and deacons are those whose claims it supports, and that they are the persons entitled to care for the church property for the use and benefit of all the members of said congregation. In other words, each of these sets of claimants to the office of deacon contends that they are the true and lawful successors in office of the original deacons, or trustees, to whom the church property was conveyed in 1873 for the use and benefit of the Primitive Baptist Church, colored, of Fayetteville. Thus the issues are brought within a narrow compass, it clearly appearing that there is no ultimate purpose to deprive any members of

the congregation of their status as members, and their right to worship in the church as members of the congregation.

In Landrith v. Hudgins, 121 Tenn., 556, 120 S. W., 783, the general rule applied in previous cases by our Supreme Court, was restated, that civil courts will not intermeddle or interfere with the internal administration of the affairs of the church, such as disciplinary cases, cases involving the exscinding of members, and the administration of rules and ordinances and the like, where the ecclesiastical body acting, or undertaking to do so, is clothed with the power and jurisdiction to act in the matter; but where property rights in church property are involved the courts will adjudicate the same, because as to such rights, the church stands on the same plane with all other persons and corporations, no higher, no lower; the law is over all. Therefore, it is only where property rights are involved that the civil courts will inquire into questions of the administration of rules and ordinances and the like, where the ecclesiastical body acting, or undertaking to do so, is clothed with the power and jurisdiction to act in the matter. Nance v. Busby, 91 Tenn., 303, 18 S. W., 874; Rodgers v. Burnett, 108 Tenn., 173, 65 S. W., 408; Travers v. Abbey, 104 Tenn., 664, 58 S. W., 247; 23 R. C. L., 440.

The case however presents certain questions of fact which the court must determine, particularly the question whether this congregation did elect Cannon and Maston, or Hickman and Wright as its deacons having the right to the custody and administration of the church property for the use and benefit of all the members of the congregation. Before we determine this question of fact, it is necessary first, to set forth the nature and form of this ecclesiastical organization.

The Colored Primitive Baptist Church was organized after the war between the States by former slaves, with the assistance of white people who were members of the regular Primitive Baptist denomination. The same system of organization, church polity, and mode of worship was adopted. The religious faith was the same. Thus the organization of the Primitive Baptist Church, colored, amounted, in very large part, to a separation of the negro members from the white members, though it became a separate denomination. The government of Primitive Baptist Churches is purely congregational, wherein the majority vote of the church controls. It has its associations and councils, voluntarily formed for certain purposes, but these are not empowered to exercise authority over the actions of the local church. The fundamental principle of the church government is self-government by majority rule. Each congregation is an ecclesiastical sovereignty within itself. An independent church, not subject to the control of any higher or ecclesiastical judicatory, is a law unto itself, self-govern-

ing and amenable to no court, ecclesiastical or civil, in the discharge of its religious functions. Hundley v. Collins, 131 Ala., 234, 32 So., 575, 90 A. S. R., 33. Its own actions are not reviewable by any other body or judicatory. A council is composed of the pastor and two delegates, or messengers, from each congregation within a given district. It is constituted for purposes purely advisory, to aid, advise and counsel, perhaps in bringing about settlement and reconciliations when dissensions arise, but its decisions are not binding on the churches. An association is composed of all of the churches within a given district. The congregation herein involved is a member of Friendship Association, which is composed of the Colored Primitive Baptist Churches in Lincoln, Franklin and Coffee counties. Neither the council, nor the association has any power, under the organization of the church, to bind the actions or conscience of the churches and their members. Bouldin v. Alexander, 15 Wall., 131, 21 L. Ed., 69. Neither of these bodies, therefore, falls within the class of church judicatories, such as are provided in the organization of the churches of some denominations, to settle finally and authoritatively such disputes, and the decisions of which on questions of theology and ecclesiastical government, are received, in many jurisdictions, as binding by the civil courts. Jarrell v. Sproles, 20 Tex. Civ. App., 387, 49 S. W., 904. There is no federal head to Baptist organizations. Each church society manages absolutely its affairs, temporal, spiritual and doctrinal. It is an unqualified democracy in which the majority is supreme. And this majority consists not of the actual membership of the legal body, but the majority that may chance to be present at any of the regular or stated meetings of the church. McRoberts v. Moudy, 19 Mo. App., 26; Windley v. McCliney, 161 N. C., 318; Poynter v. Phelps, 129 Ky., 381, 111 S. W., 699; Nance v. Busby, 91 Tenn., 303, 18 S. W., 874. And the evidence shows that this is the rule of this congregation.

The office of deacon is second only to that of pastor or elder. In the absence of the minister, a deacon takes his place, so far as to open conferences, preside as moderator, serve tables, and look to the interest of the church and pastor. He is chosen by the majority of the members of the congregation present at any meeting at which such vote can lawfully be taken. The deacons are to be chosen from among the faithful, prudent and experienced membership of the congregation so electing them, and their duties are also to care for the sick and needy members, to have charge of the temporal affairs of the church, and to counsel with and assist the pastor in advancing the welfare of the church.

The issue over the right to the office of deacon involves the question of election of Cannon and Maston, the regularity and validity of certain proceedings taken by the congregation and its pastor,

and the question of disqualification of defendants Hickman and Wright to hold the office of deacon by reason of their membership in secret orders, in violation of an alleged rule disqualifying such members of secret orders from holding the office of deacon.

In view of our holding that no civil rights of property in the church are involved, this case falls under the rule applied in Nance v. Busby, and Travers v. Abbey, supra, and in many cases in other jurisdictions involving independent religious societies. An elaborate annotation of these cases will be found in 8 A. L. R., pages 107 et seq. In Nance v. Busby, it was sought to involve the title to the property of the congregation of the Primitive Baptist Church of Nashville, the suit having been brought by certain members who had been excommunicated by the majority, even by irregular action. The complainants charged that the defendants were unorthodox, having abandoned the celebration of the Lord's Supper, ceased to observe the ordinance of the washing of feet, incorporated the church, thereby "uniting church and State," declared that one of their objects was "to maintain all missionary undertakings," and set themselves up as an oligarchy by proposing and attempting to eject summarily and without trial those who protested against their errors. The Supreme Court in an able opinion by Justice Lurton, held that, although the suit was in effect an effort of one party to obtain possession of the church property, to the exclusion of the other, the questions involved were purely ecclesiastical, and turned at last upon the excommunication of the complainants, a question with which the civil courts would not undertake to deal. The court held that the excommunication of members by such congregation, done in the exercise of its power of discipline, is valid and effectual when questioned in the civil courts to exclude the excommunicated ones from membership in the congregation, and consequently from any right to its property; and that it was not material that the proceedings were irregular, and the explusion made without giving notice, or opportunity of hearing to the excluded members; and the proceedings were nevertheless conclusive upon the court.

In Travers v. Abbey, 104 Tenn., 664, 58 S. W., 247, in which the deposed pastor of a Methodist Church sought to have himself reinstated, on the ground that he had been removed in violation of the laws of the church, it was held that such a matter was purely disciplinary, related to the ecclesiastical constitution and government of the church, and the exercise of its internal affairs, and the administration of discipline, and did not involve any questions of property or personal rights; that although the disciplinary proceeding complained of might have been an arbitrary one, irregularly conducted, measured by the disciplinary standard, that was a

matter of which the members of the church must judge, and the courts could not.

We will now apply these rules and principles as we deal with the facts of the case before us. We must determine whether or not this congregation did in fact elect officers at certain times, and if so, whom, and whether or not a civil court should pass upon the right of the congregation to depose officers, or to elect officers in violation of an alleged rule that members were disqualified from becoming ordained deacons by reason of their membership in lodges or secret societies.

In the latter part of the year 1920 elder D. D. Word was pastor, and had been pastor for about thirty-five years. Some dissension arose because of some financial transactions, and because Word insisted on maintaining a school, taught by himself in the church house, over the objection of some of the members.

The congregation had had only two deacons, Martin Finch, who had removed to Texas some two or three years before that time, and W. M. Hickman, who had died. It was claimed that Finch had not entirely forfeited the office of deacon by removing, but was an inactive deacon, and could not perform properly the duties of the office. It is insisted by complainants that at the regular conference meeting on the Saturday before the fourth Sunday in February, 1921, Cannon and Maston were elected regular deacons for life, or during good behavior, by unanimous vote of those present, being twenty-six in number. The defendants deny that this action was taken, and insist that although at said meeting the pastor, Word, himself was reelected pastor by a vote of twenty-three to five, and although he proposed at that election the election of Cannon and Maston, so much opposition arose to the election of these two men, that the election of deacons was postponed until the next regular conference meeting, the Saturday before the fourth Sunday in March, at which meeting Cannon and Maston received fourteen votes, while Arthur Hickman and Wright received twenty-three votes, and were elected. It was further insisted by defendants that elder Word thereupon announced that although Cannon and Maston had been defeated, he would ordain them anyhow, and that he proceeded thereupon to ordain them with the assistance of some elders from other churches, whom he had procured to be present in order to form a Presbytery under the usages of the church for the ordination of officers. A very large volume of testimony was taken on these issues. It should be said that the Saturday before the fourth Sunday in each month was the date for the regular meeting, or conference, of the congregation for transaction of its business, including election of officers. After the meeting in March, 1921, the dissension continued. At the conference meeting in August, 1921, Word was deposed as

pastor, by vote of twenty-three to fourteen. At the conference meeting in November, 1921, Elder Nathan Conger was elected as pastor, and Arthur Hickman and Wright were elected as deacons. The defendants do not claim that they were made regular or full deacons, but they term them temporary deacons. The complainants insist that Hickman and Wright cannot thus be lawfully elected deacons to supersede Cannon and Maston, because Cannon and Maston had been elected at the February meeting, and had not been deposed from the office of deacon by any process other than this attempt to elect Hickman and Wright. It is further insisted by complainants that Hickman and Wright were ineligible to the office of deacon, because they were members of secret societies, in violation of a rule of the congregation. The record does not show clearly that there was such a rule of the congregation, but that there was a rule of the Friendship Association seeking to prevent elders and deacons from being members of secret orders. It is evident however, that such a rule of the association cannot bind an individual church not adopting it, in view of the sovereignty of the individual church; and the only punishment that can be inflicted upon a congregation choosing such men as deacons, would be that it would no longer be a member in good standing of the association. There is evidence that the association's provision against secret orders has been disregarded for many years. There is also evidence that the provision applies only to ordained deacons, those who are qualified to handle the sacraments, and not mere temporary deacons, who look only after the property and physical welfare of the members. However, the civil court, under the rule of the aforesaid cases, would not seek to invade the powers and provinces of the ecclesiastical body having full jurisdiction to pass upon such a question. It would be unwarranted impairment of its freedom.

The right of Cannon and Maston to the office of deacon would depend first, upon their election, and also upon the right of the congregation to supersede them by the election of others at any time. There is much evidence that it was customary for deacons to hold office for life, or during good behavior, but there is no positive law or rule to that effect shown to be the law of this congregation. In the Primitive Baptist Manual, which is a part of the record, and is shown to have been treated as governing this congregation, there is a provision that all officers shall be elected annually. There is also a provision that the pastor shall serve the church as long as he and the members agree, and if there arise any disagreement between them, and either the church or pastor desire to sever their connection with each other, the pastor shall give the church ninety days notice, and if the church desires a change, it shall give the pastor ninety days notice, and pay him the balance due him on his account for services.

The principle of absolute sovereignty in the local congregation would imply a right in the majority, at a meeting duly and regularly held, to set aside a mere rule, or by law that deacons should hold office for life, or during good behavior, or that membership in a secret society would disqualify one from being an ordained deacon. As this congregation is not divided into two permanent factions, each trying to exclude the other from the use of the church property, and neither having charged the other with a departure from the faith and religious practices of the church, it is not a case in which should be applied the rule that when a division occurs in a congregation the right to the use of the church property remains in that faction which adheres to the true faith, laws and usages of the church. It is rather a question of the administration of rules and ordinances with which the civil courts will not intermeddle or interfere, as reaffirmed in Landrith v. Hudgins, supra. However, we might say, that in our opinion the office of deacon, or trustee, of a church is not one coupled with such an interest that the church body may not, at a meeting duly held, terminate the tenure of such office. Munsel v. Boyd, 30 Ohio Cir. Ct. Rep., 182. And the question of disqualification by reason of membership in secret societies is also a question over which the congregation had exclusive jurisdiction. The civil court will therefore not inquire into the validity of the election by this congregation of Hickman and Wright as deacons, on the ground, that any bylaw of the congregation may have been violated because they were members of secret societies, or lodges.

In Jarrell v. Sproles, 20 Tex. Civ. App., 387, 49 S. W., 904, it was held that in a church governed on the principle of congregational sovereignty, a division carries to the majority the control of property vested in the deacons for the use of the church. This is the well-settled rule as to such independent congregations, and we are all the more satisfied to apply it to such a case as this, where after all, it is merely a question as to the custody of the property for the use and benefit of the differing factions alike and together. The general rule is that when a person becomes a member of a church, he becomes so upon submission to its ecclesiastical jurisdiction, and however much he may be dissatisfied with the exercise of that jurisdiction, he has no right to invoke the supervisory power of a civil court, so long as none of his civil rights are invaded. 23 R. C. L., 440, and cases there cited. Having found that in November, 1921, defendants Hickman and Wright were elected by this congregation as "temporary deacons," and defendant Conger was elected as pastor, we must treat this action as final within itself in the sense that it cannot be inquired into by a civil court.

In view of these conclusions, we might pretermit any determination whether or not Cannon and Maston were ever elected as deacons, and it would be rather illogical not to do so. But this proposition is earnestly pressed upon us by proper assignment of error, and it may be our duty to dispose of it as an independent matter, in order that a full review of the case may be had if sought. The testimony is so utterly conflicting that it is quite difficult to arrive at a very satisfactory conclusion. About twelve witnesses testified that Cannon and Maston were elected unanimously at the meeting in February, 1921, and about twelve witnesses testified that they were not elected at that meeting, or at any other meeting; and that Hickman and Wright were duly elected by a vote of twenty-three to fourteen in March, 1921. Certain minutes purporting to be the minutes of the February meeting are exhibited, showing that Cannon and Maston were elected at the February meeting; but this paper seems to have been written by two women; one of whom left the meeting before it was over, and the other was the wife of the son of Elder Word, and she and her husband were very intense partisans. The woman first acting as clerk denied that the recital of the election was correct. The correctness of the minutes is also clearly denied by a number of witnesses who were not members of the family connection of Elder Word. A number of the witnesses testifying in support of the minutes were closely related to him. The witnesses testifying that Cannon and Maston were not elected, were not apparently so vitally interested as the majority of the witnesses testifying in support of the proposition—that is, with the exception of defendants Hickman, Wright and McDonald. The preponderance of the evidence in our opinion shows that Cannon and Maston were not elected, but the pastor undertook to ordain them in defiance of the action of the congregation; and that Hickman and Wright were elected by vote of twenty-three to fourteen at the conference meeting in March, 1921.

A great deal of testimony goes to certain proceedings before the council of elders and deacons of the Friendship Association, at meetings held by it in 1921 and 1922, particularly the meeting in April, 1922. The minutes of this meeting, prepared by Bruce Word, a son of Elder Word, are attacked as incorrect, and even fraudulent, and there is much evidence to sustain this attack. But the alleged action of the council relied on, to the effect that Elder Word and his faction constituted the regular congregation, could not have any binding effect in violation of the sovereignty of the individual congregation; and therefore, we do not attach any importance to these proceedings whatever they may have been, and we do not consider them in determining the questions involved in this cause.

At the first hearing of this cause in 1924, the Chancellor stopped the hearing and ordered a reference to take another vote of the congregation as to their preference for deacons as between these contending parties, limiting the vote to those who were members of the church on the fourth Sunday in March, 1921, and prior thereto. Pursuant to this order the Clerk and Master after giving notice of the time and place of meeting, it being the Saturday immediately before the fourth Sunday in April, 1924, took a vote of the members, there being thirty-seven present. He called the roll on the question as to choice of deacons, and twenty-two voted for Hickman and Wright, and fourteen voted for Cannon and Maston. One member present did not vote. It was sought by Elder Word to vote eight absent members by proxy, but the Chancellor in hearing the report of the master and confirming same, refused to consider the proxies, because it was clear that the right to vote was limited to those actually present. The Chancellor thereupon on November 8, 1924, upon the entire record in the cause, adjudged that Arthur Hickman and Charlie Wright were the duly, legal and constituted deacons of said church, and he awarded to them the right of possession of the church. He thereupon dismissed the bill of complainants and dissolved the injunction against the defendants, taxing all of the costs of the witnesses for complainants against them and the sureties on their cost bond, and all the costs of the witnesses for the defendants against them, and all the balance of the costs, including the State and county taxes, he adjudged one-half against the complainants and one-half against the defendants.

. We can appreciate the desire of the Chancellor, in view of the vast amount of conflicting testimony, to obtain a fair and unbiased expression of the wishes of the congregation; and it may be that he gave much weight to this expression so given pursuant to the reference ordered by him. His action in ordering this reference is very earnestly brought into question as having been taken beyond his power and jurisdiction. But in the views which we have taken of this case, as heretofore set forth, we are of the opinion that in holding that Cannon and Maston were not the duly elected deacons, and that Hickman and Wright were such, or rather in effect that the actions taken by the congregation as we have heretofore found, were within the exercise of its own exclusive power and jurisdiction, the Chancellor was correct, and it is, therefore, not necessary for this court to review his action in ordering the reference to ascertain again the wishes of the members of the congregation. The rule is that a correct judgment or decree will not be disturbed, although it may have been arrived at by mistaken process, or an erroneous method of reasoning. Hughes v.

Marquet, 85 Tenn., 127, 2 S. W., 20; Chambers v. Chambers, 92 Tenn., 707, 23 S. W., 67; East Tenn. & G. Ry. Co. v. Mahoney, 89 Tenn., 311, 15 S. W., 652; Litterer v. Timmons, 106 Tenn., 201, 61 S. W., 72.

Neither do we think that the Chancellor erred in his apportionment of the costs among the parties. The record in this cause comprises 700 pages, and is far more voluminous than was necessary. Neither faction was free from fault in bringing on this controversy. It would not be equitable under the circumstances for all the costs to be adjudged against the complainants. The decree of the Chancellor is affirmed. The costs of the appeal will be adjudged four-fifths against the complainants and the sureties on their appeal bond, and one-fourth against the defendants and the sureties on their appeal bond. The cause will be remanded to the chancery court of Lincoln county for further proceedings not inconsistent with this opinion.

Faw, P. J., and Crownover, J., concur.