IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 24, 2011 Session

## THE CONVENTION OF THE PROTESTANT EPISCOPAL CHURCH IN THE DIOCESE OF TENNESSEE, ET AL. v. THE RECTOR, WARDENS, AND VESTRYMEN OF ST. ANDREW'S PARISH, A TENNESSEE CORPORATION

Appeal from the Chancery Court for Davidson County
No. 09-2092-II     Carol L. McCoy, Chancellor

No. M2010-01474-COA-R3-CV - Filed April 25, 2012

An Episcopal parish in Nashville asserted its intention to disassociate from The Diocese of Tennessee, causing the Diocese to file a declaratory judgment action to determine whether it or the local congregation owned and controlled the real and personal property where the local congregation worshiped. The trial court determined that The Episcopal Church is hierarchical, and based on the canons and constitutions of the Church and its Diocese, ruled that the local parish held the property in trust for the Diocese. The church appealed, and we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Blakeley Dossett Matthews, Benjamin M. Rose, James Matthew Blackburn, Nashville, Tennessee, for the appellants, The Rector, Wardens, and Vestrymen of St. Andrew's Parish, a Tennessee Corporation.

John Richard Lodge, Jr., Anthony Joel McFarland, Wendy M. Warren, Nashville, Tennessee, for the appellees, The Convention of the Protestant Episcopal Church in the Diocese of Tennessee d/b/a The Diocese of Tennessee, a Tennessee Corporation and The Right Reverend John C. Bauerschmidt.

## OPINION

This case concerns a dispute between the Convention of the Protestant Episcopal Church in the Diocese of Tennessee and Bishop John C. Bauerschmidt (the "Diocese of Tennessee" or the "Diocese"), on the one side, and the Rector, Wardens, and Vestrymen of St. Andrew's Parish ("St. Andrew's"), on the other, over real and personal property located at 3700 Woodmont Boulevard in Nashville, Tennessee (the "Property"), where St. Andrew's church has been located for more than fifty years. As the result of certain decisions made by The Protestant Episcopal Church in the United States of America ("The Episcopal Church") in 2003, St. Andrew's informed the Diocese of Tennessee in 2006 of its desire to join a different diocese, which was part of a different church. The Diocese tried to resolve St. Andrew's concerns over the next few years.

When reconciliation talks failed, individual members of St. Andrew's announced in April of 2009 their decision to disassociate from the Diocese and The Episcopal Church. In the fall of 2009, when it became clear St. Andrew's did not intend to remain a part of the Diocese, the Diocese filed a complaint for declaratory relief and an accounting of all property located on or associated with the Property. The Diocese asked the court to declare that the Property is impressed with a trust in favor of the Diocese and that, as a result of the trust, the Diocese has the sole right to occupy and use the Property. St. Andrew's contested the Diocese's claim, arguing the Property belongs to it by virtue of a negotiated warranty deed and that there is no trust because the general rules of the Episcopal Church and the Diocese relating to property do not apply to St. Andrew's on account of its special relationship to the Diocese. The trial court, applying neutral principles of law, found that a trust existed in favor of the Diocese. Consequently, the trial court determined the property belonged to the Diocese. St. Andrew's appealed.

## I. Factual Background

Following discovery, the Diocese moved for summary judgment. The trial court entered an order granting the Diocese's motion in which it set out its findings of fact and conclusions of law, including the following:

> The Protestant Episcopal Church in the United States of America is a hierarchical religious body in structure and governance, composed of essentially three tiers, each being bound by the decisions of the higher tier, with the General Convention of the Protestant Episcopal Church exercising ultimate authority. The Plaintiff, The Convention of the Protestant Episcopal Church in the Diocese of Tennessee, d/b/a, The Diocese of Tennessee, operates at the second level and the Defendant, St. Andrew's, is found at the

-2-

third tier which is composed of the individual churches, parishes and missions.

The Diocese has its own Constitution and Canons that supplement, and must not be inconsistent with, the Church's Constitution and Canons. Article II of the Constitution of the Diocese provides that the Diocese has acceded to and adopted the Constitution of the Protestant Episcopal Church in the United States of America. The Diocesan Constitution, adopted by the General Convention in 1789 has been revised throughout the years . . . .

. . .

In 1957, the Cheek family sold the real property located at 3700 Woodmont Boulevard, Nashville, Tennessee, and the subject of this motion, for $50,000 to the Wardens and Vestrymen of the Church of the Advent, which, in 1966, conveyed the title and outstanding indebtedness to the Diocese by warranty deed.

The Defendant St. Andrew's parish was created as a mission by the Diocese in 1889 and granted permission by the Diocese to organize as a parish in the Diocese in 1960. When the mission congregation applied for membership in the Diocese in 1960, the members of the mission executed Articles of Association and acknowledged in writing that they would "accede to the constitution, canons, doctrine, discipline and worship of the Episcopal Church in the Diocese of Tennessee."

[St. Andrew's moved to the Property in 1965.] In April, 1966, the parish incorporated as "The Rector, Wardens and Vestrymen of St. Andrew's Parish." At the time of incorporation, the parish incorporators again acknowledged and acceded in writing to the "constitution, canons, doctrine, discipline and worship of the Episcopal Church in the Diocese of Tennessee." Thereafter, St. Andrew's parish was made a constituent part of The Episcopal Church and the Diocese of Tennessee.

In November, 1966, the Diocese, through its Bishop at that time, executed a warranty deed, conveying title in the real property to "The Rector, Wardens and Vestrymen of St. Andrew's Parish."

In January, 1978, St. Andrew's amended its corporate charter to delete the provision which stated "This corporation acknowledges and accedes to the constitution, canons, doctrines and worship of the Episcopal Church in the

Diocese of Tennessee."

On October 26, 2006, St. Andrew's Rector, James M. Guill, wrote the Bishop for the Diocese a letter, stating that the Vestry of St. Andrew's had "unanimously resolved to join the Diocese of Quincy [Illinois]" effective November 1, 2006.[1] The resolution states, in part, that the 2003 General Convention of The Episcopal Church (TEC) created a schism by electing a man to the episcopacy whose teachings and lifestyle are contrary to the Holy Scripture and Traditions of the Church, that the General Convention did not repent of its schismatic relations, and that the 2006 General Convention elected a person not qualified to be bishop. The document reflects St. Andrew's decision to disassociate and to separate itself from The Episcopal Church and the Diocese.

Most of the findings set out above are undisputed. However, St. Andrew's disputes the trial court's finding or conclusion[2] that The Episcopal Church is a "hierarchical religious body in structure and governance," with regard to property ownership and to St. Andrew's in particular. That issue will be discussed fully later in this opinion.

## II. GOVERNING DOCUMENTS

Through its governing body, the General Convention, The Episcopal Church has adopted a Constitution and Canons that govern the Church, its dioceses, and its parishes. Each diocese has also adopted its own Constitution and Canons that supplement those of the Episcopal Church. Such diocesan governing documents cannot be inconsistent with those of the central church. Parishes, *i.e.*, the local congregations, are governed by the documents of both The Episcopal Church and the diocese in which the parish is located.

Several provisions of these governing documents relate to real property. In 1960 when St. Andrew's became a parish of the Diocese, and in 1966 when St. Andrew's incorporated and received the warranty deed to the Property, the governing documents of The

[1] The letter itself did not state an intention to sever St. Andrew's relationship with the Diocese of Tennessee and did not state any intent to claim ownership and control of the property, including the church building. The Diocese asserts that the proposed change of affiliation of the parish with another diocese is void under the governing documents of The Episcopal Church.

[2] It is subject to debate as to whether the determination regarding the structure of the Church is a finding of fact or a conclusion of law.

-4-

Episcopal Church included several pertinent provisions, which the trial court recited in its opinion.

Two canons of The Episcopal Church, taken together, prohibited (and still prohibit) the encumbrance or alienation of any property belonging to a parish without consent of the Bishop, the head of a diocese.[3] The Diocese's Canon 17 [*New Parishes*], which was in effect in 1960[4], establishes requirements for new parishes, and such parishes are required to adopt Articles of Association that state, *inter alia*:

> (2) The Parish acknowledges and accedes to the Constitution, Canons, Doctrine, Discipline and Worship of the Protestant Episcopal Church in the Diocese of Tennessee.
>
> . . .
>
> (6) The title to all real estate now owned or hereafter acquired by this Parish shall be vested in (a) the Convention of the Protestant Episcopal church in the Diocese of Tennessee, in trust for this Parish; or (b) the Rector, Wardens and Vestrymen of this Parish or © Trustees and their successors in trust for this Parish; or (d) a religious or general welfare corporation organized under the

---

[3]Church Canon II.6.2, adopted in 1868, and remaining essentially unchanged, provides as follows:

It shall not be lawful for any Vestry, Trustees, or other body authorized by laws of any State or territory to hold property for any Diocese, Parish or Congregation, to encumber or alienate any dedicated or consecrated Church or Chapel, or any Church or Chapel which has been used solely for Divine Service, belonging to the Parish or Congregation which they represent, without the previous consent of the Bishop, acting with the advice and consent of the Standing Committee of the Diocese.

The Episcopal Church Canon 1.7, Section 3 [Canon 7: *Of Business Methods in Church Affairs*] was adopted in 1940, has remained essentially unchanged, and provides as follows:

No Vestry, Trustee, or other Body, authorized by Civil or Canon law to hold, manage, or administer real property for any Parish, Mission, Congregation, or Institution, shall encumber or alienate the same or any part thereof without the written consent of the Bishop and Standing Committee of the Diocese of which the Parish, Mission, Congregation, or Institution is a part, except under such regulations as may be prescribed by Canon of the Diocese.

[4]In 1960, the Canon was numbered 16(1).

-5-

laws of the State of Tennessee.

(7) All real estate now owned or hereafter acquired by this Parish, title to which is vested in any manner as aforesaid, shall be held, sold, transferred, alienated, conveyed, mortgaged or encumbered, in whole or in part, only in conformity with the Constitution, Canons, Doctrine, Discipline, and Worship of The Protestant Episcopal Church in the Diocese of Tennessee.

The Articles of Association of St. Andrew's Parish contained the provision set out as paragraph (2), thereby acceding to the "Constitution, Canons, Doctrine, Discipline and Worship of the Protestant Episcopal Church in the Diocese of Tennessee." The Articles also stated that its members had associated together for the purpose of "organizing a Parish according to the Doctrine, Discipline, and Worship of the Protestant Episcopal Church in the Diocese of Tennessee." The Articles of Association included verbatim the language set out in paragraphs (6) and (7) above. Consequently, the Parish stated that any property titled to the Parish was held only in conformity with the governing documents of the Episcopal Church.

Canon 10 [*Of Real Estate and Other Property*] of the Diocese of Tennessee, specifically Canon 10, Section 3, *How Title to Real Property Shall be Vested*, states as follows:

(a) After the adoption of this Canon, title to all real property thereafter acquired shall be taken and vested as follows:

. . .

(2) If title is to be held by a Parish, or by any Organization or Institution, which is **incorporated** under the laws of this state, then title shall be conveyed to it in its corporate capacity, but with these words added, "to be held subject to the Charter, Constitution and Canons of The Convention of The Protestant Episcopal Church in the Diocese of Tennessee, a corporation." (Emphasis added).[5]

In 1966, St. Andrew's filed its Charter with the State of Tennessee, and in that Charter the parish, once again, "acknowledge[d] and accede[d] to the constitution, canons, doctrine, discipline, and worship of The Episcopal Church in the Diocese of Tennessee." Following

---

[5]The record reflects that this canon was in effect as of April 2006. The record does not indicate when this canon was actually adopted.

its incorporation, St. Andrew's asked the Diocese to transfer the Property to it in the name of the incorporated parish. By warranty deed dated November 23, 1966, the Diocese transferred the Property to The Rectors, Wardens and Vestrymen of St. Andrew's Parish, a Tennessee Corporation.

The language in the warranty deed from the Diocese to St. Andrew's does not include express trust language and does not contain the provision explicitly stating that the property is held subject to the governing documents of The Episcopal Church or the Diocese. However, Canon 10, Section 1 [*Of The Use of Property*] of the Diocese of Tennessee states:

> All property of every kind and character, whether held by the Convention, or by a Parish or Mission, or by an Organization or Institution of this Diocese, and regardless of the manner in which title is vested, is held in trust to be used for the glory of God and the spread of His kingdom, according to the Constitutions and Canons, and Doctrine, Discipline and Worship of the Protestant Episcopal Church in the United States of America and of this Diocese, and for the purposes and programs of said Church and Diocese.

Additionally, Canon 10, Section 7 provides:

> If any property, real or personal, such as is referred to in Section 1 of this Canon be abandoned, or if it be devoted to uses not sanctioned by the Bishop as being in conformity with the Constitution and Canons and the Doctrine, Discipline, and Worship of the Protestant Episcopal Church in the United States of America or of this Diocese, and their purposes and programs, it shall be the duty of the Bishop, and of The Bishop and Council, to take possession of title to said property, to be held in trust by the convention for such proper use.

In 1978 St. Andrew's amended its corporate charter to delete the language, "This corporation acknowledges and accedes to the constitution, canons, doctrine, and worship of the Episcopal Church in the Diocese of Tennessee." There is no indication that the Diocese was made aware of this change in St. Andrew's corporate charter. In its brief, St. Andrew's states that this amendment was prompted by "national and local initiatives to impose trust-based obligations upon property owned by local parishes."

Indeed, in response to language in an opinion by the United States Supreme Court, as will be discussed more fully later in this opinion, The Episcopal Church adopted a canon in 1979 which The Episcopal Church refers to as its Trust Canon, and which is sometimes referred to as the Dennis Canon. That canon, Canon 1.7, Section 4, [Canon 7: *Of Business*

*Methods in Church Affairs*], provides:

> All real and personal property held by or for the benefit of any Parish, Mission
> or Congregation is held in trust for this Church and the Diocese thereof in
> which such Parish, Mission or Congregation is located. The existence of this
> trust, however, shall in no way limit the power and authority of the Parish,
> Mission or congregation otherwise existing over such property so long as the
> particular Parish, Mission or Congregation remains a part of, and subject to,
> this Church and its Constitution and Canons.

The next section of Canon 1.7, *i.e.*, Section 5 [Canon 7: *Of Business Methods in Church Affairs*] provides as follows:

> The several Dioceses may, at their election, further confirm the trust declared
> under the foregoing Section 4 by appropriate action, but no such action shall
> be necessary for the existence and validity of the trust.

### III. STANDARD OF REVIEW

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Martin v. Norfolk Southern Railway Co.*, 271 S.W.3d 76, 84 (Tenn. 2008); *Blair v. West Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004). We review the summary judgment decision as a question of law. *Id.* Accordingly, this court must review the record *de novo* and make a fresh determination of whether the requirements of Tenn. R. Civ. P. 56 have been met. *Eadie v. Complete Co., Inc.*, 142 S.W.3d 288, 291 (Tenn. 2004); *Blair*, 130 S.W.3d at 763. Those requirements are that the filings supporting the motion show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Blair*, 130 S.W.3d at 764.

The moving party has the burden of demonstrating it is entitled to judgment as a matter of law and that there are no material facts in dispute. *Martin*, 271 S.W.3d at 83; *McCarley v. West Quality Food Service*, 960 S.W.2d 585, 588 (Tenn. 1998). If the party seeking summary judgment makes a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of a genuine issue of material fact. *Martin*, 271 S.W.3d at 84; *Hannan v. Alltel Publishing Co.*, 270 S.W.3d 1, 5 (Tenn. 2008); *Staples v. CBL & Associates*, 15 S.W.3d 83, 86 (Tenn. 2000) (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993).

In our review, we must consider the evidence presented at the summary judgment stage in the light most favorable to the non-moving party, and we must afford that party all

reasonable inferences. *Doe v. HCA Health Servs., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001); *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 507 (Tenn. 2001).

## IV. COURT REVIEW OF CHURCH DISPUTES

Simply stated, the ecclesiastical abstention doctrine establishes that "courts have no ecclesiastic jurisdiction, and do not pass upon questions of faith, religion, or conscience." *Bentley v. Shanks*, 348 S.W.2d 900, 903 (Tenn. Ct. App. 1960); *see also Nance v. Busby*, 18 S.W. 874, 879 (Tenn. 1891). This doctrine, also known as the church autonomy doctrine, is rooted in the First Amendment to the United States Constitution, and its purpose is to prevent the civil courts from engaging in unwarranted interference with the practices, internal affairs, and management of religious organizations.[6] *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952); *Murrell v. Bentley,* 286 S.W.2d 359, 365 (Tenn. Ct. App. 1954). Civil courts cannot adjudicate disputes turning on church policy and administration or on religious doctrine and practice. *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708-09 (1976); *Presbyterian Church v. Mary Elizabeth Hull Memorial Presbyterian Church,* 393 U.S. 440, 446-47 (1969); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. at 116; *Gonzalez v. Roman Catholic Archbishop*, 280 U.S. 1, 16 (1929).

Because our system of government is based on separation of church and state and freedom of religion, under most circumstances, the First and Fourteenth Amendments preclude civil courts from adjudicating church fights "that require extensive inquiry into matters of 'ecclesiastical cognizance.'" *Burgess v. Rock Creek Baptist Church,* 734 F.Supp. 30, 31 (D.D.C. 1990) (citing *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. at 709-10). The United States Supreme Court has held that the underlying premise of the doctrine is that our system of government, through the First Amendment, "has secured religious liberty from the invasion of the civil authority." *Watson v. Jones,* 80 U.S. 679, 730 (1871).

Civil courts must refrain from reviewing or interfering with decisions made by a religious body on matters of church discipline, faith, or practice. *Lewis v. Seventh Day Adventists Lake Region Conference*, 978 F.2d 940, 941-42 (6th Cir. 1992). Whenever "questions of discipline, or of faith, or ecclesiastical rule, or custom, or law have been

---

[6]The First Amendment's free exercise guarantee and its prohibition against laws respecting the establishment of religion have been made wholly applicable to the states by the Fourteenth Amendment. *School District of Abington Township v. Schempp*, 374 U.S. 203, 215-216 (1963); *Cantwell v. Connecticut,* 310 U.S. 296, 303 (1940). Courts have at times varied in their identification of the source of the ecclesiastical abstention doctrine as the Free Exercise Clause or the Establishment Clause, or both. *See Rosati v. Toledo Catholic Diocese*, 233 F. Supp 2d 917, 920 (N.D. Ohio 2002)(stating that the majority hold that the doctrine is founded in the Free Exercise Clause)..

decided by the highest of . . . church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." *Watson v. Jones,* 80 U.S. at 727.

The Tennessee Supreme Court similarly held long ago that courts of this State are without jurisdiction to inquire into or supervise the decisions of religious organizations. *Nance v. Busby*, 18 S.W. at 881 (citing *Watson*, 80 U.S. at 727). Tennessee courts have continued to refuse to hear disputes that are perceived to be purely ecclesiastical in nature. *Travers v. Abbey*, 58 S.W. 247, 247-48 (Tenn. 1900) (holding that dispute over removal of pastor did not involve property or personal rights, but instead related to governance of and discipline by church, and courts would not review the decisions of ecclesiastical judicatures); *Martin v. Lewis*, 688 S.W.2d 72, 73 (Tenn. Ct. App. 1985). The Court recently reaffirmed that,

> Over the course of more that a century following the Nance v. Busby decision, Tennessee's courts have continued to recognize ecclesiastically required jurisdictional limitations on civil courts. Thus, the ecclesiastical abstention doctrine has been applied to preclude judicial review of matters involving religious institutions that are ecclesiastical and internal in nature.

*Redwing v. Catholic Bishop for the Diocese of Memphis,* __S.W.3d__, 2012 WL 604481, at *8 (Tenn. Feb. 27, 2012).

Religious organizations may establish their own rules and regulations for internal discipline and government and create tribunals for adjudicating disputes over these matters. *Milivojevich*, 426 U.S. at 724. Decisions by the governing bodies of religious organizations on matters related to doctrine, faith, or **church governance** and discipline are not reviewable by civil courts. *Mason v. Winstead*, 265 S.W.2d 561, 563 (Tenn. 1954) (holding that in ecclesiastical matters, church tribunals have exclusive authority without interference from the civil courts.) The ecclesiastical abstention doctrine prohibits secular courts from redetermining the correctness of a decision by a religious tribunal on issues of canon law, religious doctrine, or **church governance**. *Milivojevich*, 426 U.S. at 710.[7]

---

[7]Although the United States Supreme Court's statements regarding ecclesiastical abstention speak in terms of hierarchical church organizations, there is no reason to refuse to apply the First Amendment analysis to congregational churches or those religious organizations not hierarchical in structure. *See Callahan v. First Congregational Church of Haverhill*, 808 N.E.2d 301, 308 (Mass. 2004); *Heard v. Johnson,* 810 A.2d 871, 879 n.4 (D.C. Circ. 2002); *Burgess v. Rock Creek Baptist Church*,734 F.Supp. at 31 n. 2; *Guinn v. The Church of Christ of Collinsville*, 775 P.2d 766, 771 n.18 (Okla. 1989). Where, as in the case before us, the religious body has adopted a hierarchical polity, it is not necessary to examine the
(continued...)

In explaining the judicial policy of non-intervention in intrachurch disputes, courts have often discussed the voluntary nature of membership in religious organizations. In the United States people have an unquestioned right to form voluntary religious associations and to organize the governance of their congregations in whatever way they deem appropriate. *Watson*, 80 U.S. at 728-29. By joining such organizations, individuals consent to their governing structures and bind themselves to submit to the organization's rules. *Id.*

The ecclesiastical abstention doctrine itself applies only to issues that would require the courts to examine or determine questions of religious belief or practice. "[N]ot every civil court decision . . . jeopardizes values protected by the First Amendment." *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. at 449. Even where intrachurch disputes occur, as in the case before us, courts still have jurisdiction to decide some issues, as long as that resolution will not require the court to engage in extensive inquiry into religious law or doctrine. *Burgess v. Rock Creek Baptist Church*, 734 F.Supp. at 32 (stating that courts can adjudicate church disputes "under narrow circumstances").

For example, where resolution of an intrachurch property dispute does not risk the prohibited court entanglement, courts may decide such controversies. The United States Supreme Court has held that courts can decide church property disputes, without violating the First Amendment, by using one of several methods. "Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property." *Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. at 449. The Court noted that there are neutral principles of law, developed for use in all property disputes, which can be applied "without 'establishing' churches to which property is awarded." *Id*. The Court cautioned, however, against courts deciding ownership of property on the basis of resolution of controversies over religious doctrine and practice or church governance and discipline, such as where use of property is conditioned upon adherence to doctrine. *Id*.

In his concurring opinion in a later decision, Justice Brennan explained that a court could comply with *Hull* in a variety of ways. *Maryland and Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368 (1970). First, he discussed the approach used in *Watson v. Jones*, 80 U.S. 679 (1872). Essentially, that approach required courts to follow the decision of the governing body of the entity involved: if a church of **congregational polity**, then the majority of its members or other local body created for ecclesiastical government; if a church of **hierarchical polity**, then the highest

---

[7](...continued)
application of the doctrine in other types of organizations.

authority that has ruled on the dispute, absent "express terms" in the deed or other instrument to the contrary. *Sharpsburg*, 396 U.S. at 370.

Another approach discussed by Justice Brennan was the application of "neutral principles of law, developed for us in all property disputes" as described in *Hull*.[8] *Id*. The Court later cited Justice Brennan's concurrence in *Sharpsburg*, 396 U.S. at 368, for the proposition that a state may adopt any one of various approaches for settling church property disputes, as long as the court does not get entangled in doctrinal matters. *Jones v. Wolf*, 443 U.S. 595, 602 (1979).

In discussing the advantages of the "neutral principles of law" approach, the Court stated:

The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglements in questions of religious doctrine, polity, and practice. Furthermore, the neutral principles analysis shares the peculiar genius of private-law systems in general - flexibility in ordering private rights and obligations to reflect the intentions of the parties. Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members.

*Jones v. Wolf*, 443 U.S. at 603-04.

The Court recognized that the neutral principles approach might require a civil court to examine **religious documents such as a church constitution for language of a trust** in favor of the central church. *Jones v. Wolf*, 443 U.S. at 604.[9] Additionally, the Court

---

[8]In the *per curiam* majority opinion in *Sharpsburg*, the Court affirmed the lower court's decision in a dispute over church property between the central church and secessionist congregations. The lower court had relied upon state statutory law, language in the deeds conveying the property, the charters of the religious corporations, and provisions in the constitution of the central church pertinent to the ownership and control of church property. 396 U.S. at 367-68.

[9]If a document "incorporates religious concepts in the provisions relating to the ownership of property," and the court would be required to resolve a religious controversy in order to determine
(continued...)

explained that under the neutral principles approach,

> At any time before the dispute erupts, the parties can ensure, should they so desire, that the factions loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. . . . And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.

*Jones v. Wolf*, 443 U.S. at 606 (footnote omitted).

The Episcopal Church followed the suggestion made by the Court in *Jones v. Wolf* and in 1979 adopted the canon called the "Dennis Canon" or the "Trust Canon."

Tennessee courts have exercised jurisdiction over actions arising from intrachurch disputes when property rights are involved. *Ward v. Crisp*, 226 S.W.2d 273, 275 (Tenn. 1949) (involving construction of trust on church property); *Crenshaw v. Barbour*, 36 S.W. 87, 90 (Tenn. 1931); *Rodgers v. Burnett*, 65 S.W. 408, 410 (Tenn. 1901). Nonetheless, they have been careful in those cases to decide only the issues dealing with the civil or property right involved using neutral principles of law. *Landrith v. Hudgins*, 120 S.W. 783, 807 (Tenn. 1908); *Nance v. Busby*, 18 S.W. at 879; *Fairmount Presbyterian Church, Inc. v. Presbytery of the Holston of the Presbyterian Church of the United States*, 531 S.W.2d 301, 306 (Tenn. Ct. App. 1975).

Thus, Tennessee has long used the neutral principles approach in determining disputes over ownership of church property, where examination into church doctrine or practice is not required. "[T]he application of the ecclesiastical abstention doctrine has not been extended to 'questions of property or personal rights,'" and Tennessee courts have permitted adjudications based upon neutral principles. *Redwing v. Catholic Bishop for the Diocese of Memphis,* 2012 WL 604481, at *8. For example,

> The only issue before the [trial] court was an interpretation of the two deeds to the church property. The civil courts have the power to make that decision and the courts have frequently exercised that power when a church division calls into question the rights to property.

---

[9](...continued)
ownership, the court must defer to the appropriate ecclesiastical body. *Id.*

-13-

*Emmanuel Churches of Christ v. Foster*, 2001 WL 327910, at *2 (Tenn. Ct. App. Apr. 5, 2001) (*citing Fry v. Emmanuel Churches of Christ, Inc.*, 839 S.W.2d 406 (Tenn. Ct. App. 1992)).

In *Emmanuel Churches of Christ v. Foster*, the grantor of the property had specified in the deed that the property would remain under the control of the trustees of the local congregation to ensure that the local trustees would have the power to decide what to do with the property if there were a controversy within the larger church organization. 2001 WL 327910, at *3. The court, applying rules applicable to all property questions in Tennessee, determined and enforced the grantor's intent as found in the language of the deed. *Id.*

Such intrachurch property disputes also arise in the context of the withdrawal of a local congregation from a central church or denomination.

> While our courts have declined to adjudicate religious matters, they have held that they would intervene in genuine disputes regarding property rights when there has been a withdrawal by a local church. *Church of God in Christ, Inc. v. Middle City Church of God in Christ*, 774 S.W.2d 950, 952-53 (Tenn. App. 1989); *Padgett v. Verner*, 366 S.W.2d 545, 549 (1969).

*Fry v. Emmanuel Churches of Christ, Inc.*, 839 S.W.2d at 409.

In *The Cumberland Presbyterian Church v. North Red Bank Cumberland Presbyterian Church*, 430 S.W.2d 879 (1968), this court considered a dispute over church property between the central or national church and a local congregation that withdrew from the national church and asserted title to the property where the congregation worshiped. 430 S.W.2d at 426. Based upon review of relevant church governing documents, the court determined that when a congregation agreed to withdraw from the central church, there was a dissolution of the congregation, "with the result that title to property of the local church passes to the parent organization for the advancement of the purposes of the trust" established by church governing documents. 430 S.W.2d at 429.

Similarly, In *Fairmount Presbyterian Church, Inc.*, *supra*, this court considered a dispute over church property between the national Presbyterian Church in the United States (a hierarchical church) and a local Presbyterian congregation that had voted to withdraw from the national Church. The Court of Appeals chose to apply neutral principles of law[10] and

_____

[10]The *Fairmount* court discussed the approach previously used following *Watson v. Jones* and described the rule from *Watson* as "courts must accept the decision of the highest church authority to which

(continued...)

examined the deeds and the church's charter. The court concluded that the church's charter clearly implied that the purpose of the corporation was to be a "local church of the Presbyterian Church in the United States" and that the purposes listed in local church's charter were modified by the language, "in accord with the Standards of the Presbyterian Church in the United States." Consequently, the court found that "upon property being conveyed to the corporation, an implied trust arose in favor of the general church." 531 S.W.2d at 305-06.

The neutral principles approach "has never been extended to religious controversies in the areas of church government, order and discipline, nor should it be." *Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir.1986). Courts presiding over church disputes must be careful not to violate the protections of the First Amendment by deciding who prevails on the basis of resolution of the underlying controversy over religious doctrine and practice. *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. at 449 (holding that if intrachurch property dispute required interpreting and weighing church doctrine, a court could not intervene; if, however, neutral principles of law could be applied without determining underlying question of religious doctrine and practice, a court could intervene).[11]

_____

[10](...continued)
a dispute has been appealed, even when the dispute involves church property." In *Fairmount*, an ecclesiastical body had decided the issue of church property ownership, and no appeal had been taken to a higher body within the Presbyterian Church. The Court of Appeals chose to apply the neutral principles of law approach set out in the later (post-*Watson*) opinion in *Mary Elizabeth Blue Hull Memorial Presbyterian Church.*

[11]For example, even disputes over church property between rival factions within a religious organization may create the danger that the State, through the court, will determine the rights to the property on the basis of the doctrinal beliefs or interpretations espoused by each party. *See Milivojevich*, 426 U.S. at 709. Even where property rights are involved, judicial intervention is still prohibited where courts would be called upon to resolve underlying disputes over religious doctrine or practice. *Id.* at 709-10 (holding that because rights to church property were tied to decisions over bishop defrocking, courts could not decide property rights without deciding the underlying religious disputes, which was prohibited); *Natal v. Christian and Missionary Alliance*, 878 F.2d 1575, 1577 (1st Cir. 1989); *Hutchison v. Thomas*, 789 F.2d at 396. *See also Jones v. Wolf*, 443 U.S. at 602 (1979) ("the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice"). The First Amendment "commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine." *Presbyterian Church v. Mary Elizabeth Blue Hull Mem. Presbyterian Church*, 393 U.S. at 449.

In a case involving both ownership of church property and the excommunication of one faction of a church by another, the Tennessee Supreme Court explained the difficulties courts would confront if they were to deal with matters of religious doctrine or church governance in the name of deciding other rights:

(continued...)

## V. EXISTENCE OF A TRUST

The trial court made the following conclusion of law:

Having considered these facts, the Court concludes as a matter of law that the real property and improvements located at 3700 Woodmont Boulevard, Nashville, Tennessee and the associated personal property are **impressed with a trust** in favor of the Diocese of Nashville.

In reaching this conclusion, the trial court recognized the limitations on court interference in church disputes, applied neutral principles of law, and carefully examined the relevant documents, including the deed, the Articles of Association, the charter and amendment, the constitution and canons of the Diocese, and the canons of The Episcopal Church. The court reasoned:

If this Court is to determine who owns the church property in question, both the real and personal property located at 3700 Woodmont Boulevard, an examination of the warranty deed using neutral principles of law is required. Such an examination reveals that the property was conveyed to "The Rector, Wardens and Vestrymen of St. Andrew's Parish, a Tennessee Corporation." To ascertain the owner(s) of the Corporation, the court examines the Articles of Incorporation, which reflects that the original incorporators who executed the Charter of Incorporation were Edwin L. Conley, W.R. Baker, H.L., Weatherby, Jr., Walter Sullivan and Lewis B. Hollabaugh, all of whom acknowledged and acceded in writing to the constitution, canons, doctrine, discipline and worship of the Episcopal Church in the Diocese of Tennessee, a provision which is set out in the Charter of Incorporation.

---

[11](...continued)
. . . the whole subject of the doctrinal theology, the usages and customs, the written laws and fundamental organization of every religious denomination must be examined into with minuteness and care, for they would become, in almost every case, the criteria by which the validity of the ecclesiastical decree would be determined in the civil court. This principle would deprive these bodies of the right of construing their own church laws . . . and would in effect, transfer to the civil courts, where property rights were concerned, the decision of all ecclesiastical questions.

*Nance v. Busby*, 18 S.W. at 880. While, as a practical matter, it can sometimes prove difficult to distinguish between disputes that can be resolved by neutral principles of law and those that may involve the court in "excessive entanglement" with matters of religious doctrine and organization, courts must make that distinction so as to avoid inquiry prohibited by the First Amendment.

. . .

In the present case, an examination of the deed, the Articles of Incorporation, the Articles of Association and the Constitution and Canons of The Episcopal Church and the Diocese reveals a trust imposed upon the property for the benefit of the Diocese and The Episcopal Church. Any further declaration would require the Court to resolve a religious controversy, which is forbidden by the First Amendment.

While the disassociating individuals have an unquestioned right to form another voluntary religious association and to organize the governance of a new organization in whatever way they deem appropriate, they no longer accede to the Constitution and Canons of The Episcopal Church and the Diocese and accordingly, they are not entitled to claim any ownership interest to any property held in trust for the Diocese by "The Rector, Wardens and Vestrymen of St. Andrew's Parish, a Tennessee Corporation."

Our review of the relevant documents reveals the following. When it was organized to become a parish, the founders of St. Andrew's stated in its Articles of Association that it "acknowledges and accedes to the Constitution, Canons, Doctrine, Discipline and Worship of the Protestant Episcopal Church in the Diocese of Tennessee;" and that all real estate St. Andrew's acquires "shall be held, sold, transferred, alienated, conveyed, mortgaged or encumbered, in whole or in part, only in conformity with the Constitution, Canons, Doctrine, Discipline, and Worship of the Protestant Episcopal Church in the Diocese of Tennessee."

Similarly, when certain individuals from St. Andrew's incorporated as The Rector, Wardens and Vestrymen of St. Andrew's Parish, the Articles of Incorporation stated that the corporation "acknowedge[d] and accede[d] to the constitution, canons, doctrine, discipline, and worship of the Episcopal Church in the Diocese of Tennessee."

Canon II.6(2) of The Episcopal Church's Constitution and Canons prohibits a parish such as St. Andrew's from encumbering or alienating real property that has been consecrated without the consent of the Bishop and the Diocese. Canon III.9.5(a) provides that the rector of each parish is entitled to control parish property "subject to the Rubrics of the Book of Common Prayer, the Constitution and Canons of this Church and the pastoral direction of the Bishop."

Canon 1.7, section 4, also referred to as the Dennis Canon or the Trust Canon, was adopted in 1979 by The Episcopal Church following the suggestion made by the United

-17-

States Supreme Court in *Jones v. Wolf.* That suggestion was that churches could resolve property questions before a dispute erupts by modifying documents to include a trust.[12] "[C]ivil courts will be **bound to give effect to the result indicated by the parties, provided it is embodied in some legally recognizable form**." *Jones v. Wolf*, 443 U.S. at 606 (emphasis added).

The Trust Canon clearly states that any property held by or for the benefit of any parish or congregation "**is held in trust for this Church and the Diocese thereof**" of which the congregation is a part. Set out fully above, the Canon also states the local congregation has authority over such property "so long as" the congregation remains **"a part of and subject to this Church and its Constitutions and Canons."**

This provision is unambiguous and needs no interpretation. It speaks for itself. *See The Episcopal Church in the Diocese of Connecticut v. Gauss*, 28 A.3d 302, 318 (Conn. 2011) (generally discussing the Dennis Canon and concluding "there is no genuine issue of material fact as to whether the Parish controls the disputed property . . . because the Dennis Canon expressly provides that all parish property is held in trust for the Episcopal Church and the diocese in which the parish is located").

While the Trust Canon, or Dennis Canon, was adopted after the Property was transferred to St. Andrew's, when the congregation decided to associate with The Episcopal Church and the Diocese in 1960, and when St. Andrew's filed their Articles of Incorporation in 1966, the parish agreed to be bound by the constitution and canons of The Episcopal Church and the Diocese. St. Andrew's remained a parish within The Episcopal Church and the Diocese long after the Dennis Cannon was adopted by the Church's governing body.

The *Gauss* court considered and rejected the local parish's argument that the Dennis Canon should not apply to it because the canon was enacted by the General Convention of the Episcopal Church after the relevant real estate transaction took place, which is one argument made herein by St. Andrew's. 28 A.3d at 318. The *Gauss* court explained:

> [I]n agreeing in 1956 [when the parish applied for admission to the general church as a parish] to abide by the constitution and canons of the Diocese, members of the congregation also agreed to abide by the constitution and canons of the Episcopal Church, including the subsequently enacted Dennis Canon. There is no provision in the constitution and canons of the Episcopal Church or the Diocese expressing an intent to the contrary or

---

[12]The Court specifically referred to ensuring that "factions loyal to the hierarchical church will retain the church property" by trust or similar language. *Jones v. Wolf*, 443 U.S. at 606.

excusing a parish, either explicitly or implicitly, from complying with amendments or additions to the constitution and canons that might be enacted after a parish is accepted by the Diocese.

*Id*. at 320.

In addition to the Dennis Canon, the Diocese has adopted its own canons governing parish property. Diocesan Canon 9 provides that real estate belonging to a parish shall not be sold, transferred, alienated, conveyed, or encumbered without the consent of the General Convention or the Bishop and Council. Clearly, as the trial court held, the church governance documents leave no question that the Property was held subject to a trust in favor of the Diocese and The Episcopal Church.

The issue whether an Episcopalian congregation that decides to break away from The Episcopal Church is able to retain possession over the real property where its congregation worships has been litigated numerous times over the last thirty-five years. In addition to *Gauss*, a majority of courts in other states that have considered the same type of dispute between local former parishes and The Episcopal Church and its dioceses have reached the same conclusion that we do; *i.e.*, the church governing documents clearly create a trust in favor of the central church and/or its dioceses over any property held and used by a local parish, even when the record title to the property in question has been held in the name of the local parish since a time before the Dennis Canon was enacted. *See, e.g., Episcopal Church Cases*, 198 P.3d 66, 79-82 (Cal. 2009) (holding that in consideration of Dennis Canon and parish's promise to be bound by constitution and canons of general church in original application in 1947 to become parish and in articles of incorporation in 1949, parish held property in trust for general church and could use property only so long as parish remained part of general church), *cert. denied sub nom. Rector, Wardens & Vestrymen of Saint James Parish in Newport Beach, California v. Protestant Episcopal Church in the Diocese of Los Angeles*, 130 S. Ct. 179, 175 L.Ed.2d 41 (2009); *Episcopal Diocese of Rochester v. Harnish*, 870 N.Y.3d 340, 351-52, 899 N.E.2d 920, 922-25 (N.Y. Ct. App. 2008) (holding that parish held real property in trust for general church based upon parish's agreement to abide by constitution and canons of general church upon incorporation in 1927 or upon recognition as parish in 1947 together with language of Dennis Canon establishing express trust in favor of general church); *In re Church of St. James the Less*, 888 A.2d 795, 807-09 (Pa. 2005) (holding parish held property in trust for benefit of general church because (1) parish agreed in its charter to "always accede to the authority of the National Episcopal Church and the Diocese" and (2) the Dennis Canon created an express trust in favor of the Church); *see also Masterson v. Diocese of Northwest Texas*, 335 S.W.3d 880, 891 (Tex. Ct. App. 2011) (despite property's title held by parish, governing documents of national Episcopal Church show parish holds property in trust for national Church).

We conclude that the documents are clear and that St. Andrew's has held or controlled the Property under an express trust in favor of the Diocese and/or The Episcopal Church. Despite the language of the documents involved, St. Andrew's argues that it did not hold the Property in trust asserting that the language in the church's governing documents regarding real property should not be applied to St. Andrew's.

## VI. WHETHER THE EPISCOPAL CHURCH IS HIERARCHICAL FOR ALL PURPOSES

St. Andrew's asserts that no matter how clear the church governance documents may be regarding establishment of a trust, those documents do not create a trust in this instance because they simply do not apply to St. Andrew's. This argument is based upon St. Andrew's assertion that The Episcopal Church is not hierarchical for all purposes and, in particular, with regard to property ownership and control.

"Hierarchical churches may be defined as those organized as a body with other churches having similar faith and doctrine with a common ruling convocation or ecclesiastical head." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 110 (1952). The United States Supreme Court has explained that when dealing with hierarchical churches the courts "are bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments." *Watson v. Jones*, 80 U.S. 679, 726-27 (1871).

St. Andrew's argues that if it is determined that The Episcopal Church is not hierarchical for purposes of property disputes, the Church's canons and constitutions cited above are not determinative of whether it or the Diocese owns the Property. Instead, according to St. Andrew's, the language of the warranty deed, which does not include any trust language, along with the parties' negotiations when the Property was transferred evidence that it, not the Diocese, is the rightful owner of the Property.

Tennessee courts, as well as courts of other states, have distinguished between hierarchical churches and congregational churches for limited purposes. If a church is congregational and independent, its members constitute the highest authority on ecclesiastical matters, including church governance and discipline. *Nance v. Busby*, 18 S.W. at 881.

In *Cannon v. Hickman*, 4 Tenn. App. 588 (Tenn. Ct. App. 1927), the court described the church whose property was in dispute as "purely congregational" with no federal head of an organization of churches of the same denomination with authority over actions of the

local church. 4 Tenn. App. at 590. In that situation, "[e]ach congregation is an ecclesiastical sovereignty within itself," and "each church society manages absolutely its affairs, temporal, spiritual and doctrinal." *Id*. at 590-91. Such congregations are considered ecclesiastical sovereignties and democracies, governed by the majority of its members. *Id*. As another example, in an intrachurch dispute, this court observed that "[i]n matters of government churches of Christ are all congregationally autonomous." *Royal Heights Church of Christ*, 1987 WL 18670, at *3 (Tenn. Ct. App. Oct. 21, 1987).

On the other hand, our courts have concluded some churches are hierarchical in their organization. In *Fairmount Presbyterian Church, Inc. v. Presbytery of Holston of the Presbyterian Church of the United States*, *supra*, this court stated that the central church in the lawsuit was a hierarchical church and described the components of its organization:

> The Presbyterian Church in the United States is a connectional or hierarchical church, as distinguished from a congregational one. Each local congregation is governed by a group of elders known as the Session. The local churches are grouped into Presbyteries . . . . These are grouped into Synods . . . which are presided over by the General Assembly of the church. These governing bodies all have both legislative and judicial functions.

511 S.W.2d at 302 n.1.

The Texas Court of Appeals has set forth the following test to determine whether or not a church is hierarchical:

> (1) the affiliation of the local church with a parent church, (2) an ascending order of ecclesiastical judicatories in which the government of the local church is subject to review and control by higher authorities, (3) subjugation of the local church to the jurisdiction of a parent church or to a constitution and canons promulgated by the parent church, (4) a charter from the parent church governing the affairs of the local church and specifying ownership of local church property, (5) the repository of legal title, and (6) the licensing or ordination of local ministers by the parent church.

*Masterson v. Diocese of Northwest Texas*, 335 S.W.3d 880, 890 (Tex. Ct. App. 2011) (citing *Templo Ebenezer, Inc. v. Evangelical Assemblies, Inc*., 752 S.W.2d 197, 198–99 (Tex. App. 1988); *Schismatic & Purported Casa Linda Presbyterian Church v. Grace Union Presbyterian*, 710 S.W.2d 700, 702 (Tex. App. 1986); *Browning v. Burton*, 273 S.W.2d 131, 133–34 (Tex. Civ. App.1954)).

The trial court described the organization of The Episcopal Church, including its three tiers and the governance of the general or central church, its dioceses, and its parishes. Those facts establish that The Episcopal Church is a hierarchical church, using the test set out above and the tests applied in Tennessee and other courts.

As stated earlier, property disputes arising when an Episcopalian congregation decides to break away from The Episcopal Church have been before the courts in a number of states. In all of the opinions we have reviewed, either the parties agreed, or the courts concluded, that The Episcopal Church is hierarchical. *See, e.g., Daniel v. Wray*, 580 S.E.2d 711, 717-18 (N.C. App. Ct. 2003) (holding The Episcopal Church and its congregations are part of a hierarchical organization in which the constitutions and canons of The Episcopal Church and of the diocese govern the congregations and their role within the organization).

St. Andrew's has cited no case in which a court has concluded The Episcopal Church is not hierarchical, for property matters or otherwise. The Georgia Court of Appeals recently considered whether a local parish that sought to disaffiliate from the national church could retain control over the church property in *The Rector, Wardens and Vestrymen of Christ Church in Savannah v. Bishop of the Episcopal Diocese of Georgia*, 699 S.E.2d 45 (Ga. Ct. App. 2010), *aff'd* 718 S.E.2d 237 (Ga. 2011). The appellate court determined that "even though the parish owns its own real estate, the discipline, canons, and constitutions of the National Episcopal Church and the Diocese of Georgia established an implied and express trust over the property for the use of the National Episcopal Church." *Id*. at 47. The court also examined the same issue raised herein by St. Andrew's.

In determining that The Episcopal Church was hierarchical for all purposes, including the resolution of property disputes,[13] the *Christ Church in Savannah* court wrote:

> Here, careful consideration of the National Episcopal Church's structure and history persuades us that the National Episcopal Church is hierarchical. The church organization has three tiers: (1) the National Episcopal Church, (2) geographically-defined dioceses that belong to, are subordinate to, and are under the jurisdiction of the National Episcopal Church, and (3) local parishes that belong to, are subordinate to, and are under the jurisdiction of the National Episcopal Church and the individual diocese in which the parish is located. At the present time, the National Episcopal Church is comprised of 111 dioceses and thousands of individual churches,

[13]When this case was before the Supreme Court of Georgia, there was no longer any dispute that The Episcopal Church was hierarchical. *The Rector, Wardens and Vestrymen of Christ Church in Savannah v. Bishop of the Episcopal Diocese of Georgia*, 718 S.E.2d at 240-41.

-22-

each of which must be affiliated with a diocese. The National Episcopal Church is governed by a general convention composed of bishops and deputies. The dioceses are governed by bishops and an annual convention. Each parish is governed by a vestry, which is akin to a board of directors. The vestry of each church sends delegates to its diocesan convention, and each diocese sends delegates to the general convention. There are governing documents at each level of the church. The National Episcopal Church has a constitution and canons, which are similar to bylaws. The dioceses also have constitutions and canons, but these are subordinate to the governing documents of the National Episcopal Church. The individual parishes are controlled by the terms of their charters and bylaws, which are in turn subordinate to the constitutions and canons of both the diocese and the National Episcopal Church. In addition, the dioceses and parishes are subject to the doctrine, discipline, and worship of the National Episcopal Church generally.

*Id*. at 48.

Other courts have reached the same conclusion. *See Masterson v. Diocese of Northwest Texas,* 335 S.W.3d at 890 (holding Episcopal Church is hierarchical for all purposes, including the resolution of property disputes); *Diocese of Massachusetts v. Devine*, 797 N.E.2d 916, 921-24 (Mass. App. Ct. 2003) (holding Episcopal Church is hierarchical for all purposes, including determining property disputes); *Daniel v. Wray*, 580 S.E.2d at 717 (Episcopal Church is hierarchical church for purposes of determining property disputes); *Rector, Wardens, and Vestrymen of Trinity-St. Michael's Parish v. The Episcopal Church in the Diocese of Connecticut,* 620 A.2d 1280, 1286 (Conn. 1993) (rejecting local church's argument that canons of The Episcopal Church are of moral value only, concluding hierarchical relationship governs all matters, including property dispute between local church and diocese); *Protestant Episcopal Church in the Diocese of New Jersey v. Graves*, 417 A.2d 19, 24 (N.J. 1980) (holding Episcopal Church is hierarchically structured and hierarchical nature of relationship determines control over property when local church disassociates); *see also Protestant Episcopal Church in Diocese of Virginia v. Truro Church*, 694 S.E.2d 555, 558 (Va. 2010) (holding Episcopal churches are hierarchical).

There is nothing in the language of the relevant documents to indicate that the hierarchical organization of the church is not applicable to the control and ownership of real property. To the contrary, specific language regarding property, quoted earlier in this opinion, clearly establishes that the central church and dioceses have authority to control the use and disposition of property, separate and apart from the trust language. Based on the language of the Canons and Constitutions of The Episcopal Church and of the Diocese, we join the majority of jurisdictions in holding that The Episcopal Church is a hierarchical

organization for all purposes, including ownership and control of real and personal property.

St. Andrew's contends that it created a genuine issue of material fact concerning whether The Episcopal Church is hierarchical for temporal matters, including property disputes. St. Andrew's submitted an affidavit by a former bishop of a diocese in Illinois, an affidavit by a board member of a diocese in Florida, and a document entitled Bishops' Statement on the Polity of The Episcopal Church (the "Bishops' Statement"). The former bishop stated that The Episcopal Church is not hierarchical for any purpose. The board member opined that The Episcopal Church is not hierarchical for "the issues in this dispute." The Bishops' Statement is dated April 18, 2009, and appears to be authored by fifteen or so bishops and former bishops, but does not appear to be sanctioned by The Episcopal Church or the General Convention. The Bishops' Statement suggests, *inter alia*, that The Episcopal Church is a voluntary association of equal dioceses.

The affidavits St. Andrew's offered do not create a disputed issue of material fact because the affiants were simply offering their opinions and interpretations of the constitutions and canons, not facts. The constitutions and canons, as well as St. Andrew's filings and Articles of Association, speak for themselves and are determinative of the issue. As discussed earlier in this opinion, when resolving disputes involving hierarchical churches, the courts will defer to the highest church authority on questions of church governance. In such situations, the courts "are bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments." *Watson v. Jones*, 80 U.S. at 726-27. We think that includes interpretation of church governing documents and interpretation of the basic organization of the church. Consequently, we cannot conclude that there is a factual question regarding the organization and governance of The Episcopal Church and will not inquire into it.

## VII. NEUTRAL PRINCIPLES APPROACH

As explained earlier, "where resolution of an intrachurch property dispute does not risk the prohibited court entanglement and involves only nondoctrinal matters, courts may decide such controversies. In doing so, they apply 'neutral principles of law' developed for use in all property disputes." *Anderson v. Watchtower Bible and Tract Soc. of New York*, 2007 WL 161035, at *7 (Tenn. Ct. App. Jan. 19, 2007) (citing *Jones v. Wolf*, 443 U.S. 595, 604 (1979)).

St. Andrew's asserts that the trial court herein did not actually, or properly, apply the "true" neutral principles approach. Essentially, St. Andrew's seems to argue that the court should only have looked at the warranty deed transferring the Property. The warranty deed does not include express trust language, and St. Andrew's relies heavily on the language

conveying fee to the vestry. Of course, the governing documents of The Episcopal Church and the Diocese recognize that title may be held by the local congregation. The fact that a deed reflects the grantee to be the vestry of the local congregation does not contradict the existence of a trust. To the contrary, a finding that a local congregation (or any other grantee) holds real property subject to a trust for the benefit of the central church (or another person or grantor) would never arise if the property were titled to the central church (or other beneficiary of the trust).

St. Andrew's argument that courts must look only to the deed ignores the holdings of Tennessee and other courts that application of neutral principles of law in intrachurch property disputes includes consideration of church governing documents, not just the document transferring the property. Such documents are certainly relevant to determining the context in which the transfer of the property took place as well as the intentions of the parties at the time of transfer.

For example, in *Fairmount*, *supra*, the court specifically stated it was applying neutral principles of law. The court examined the local church's charter and found that the purpose of the corporation was to be a local church of the Presbyterian Church in the United States and that the various activities listed in its corporate purpose were modified by the language, "in accord with the Standards of the Presbyterian Church in the United States." *Fairmount Presbyterian Church, Inc*. 531 S.W.2d at 302. Consequently, the court found any property conveyed to the corporation was subject to an implied trust in favor of the general church . *Id*. at 305-06.

In *North Red Bank Cumberland Presbyterian Church*, *supra*, this court considered a dispute over church property between the central or national church and a local congregation that withdrew from the national church and asserted title to the property where the congregation worshiped. 430 S.W.2d at 426. The appellate court described the case as turning on "whether, in the absence of a controlling provision of the deed or church canon expressly forfeiting title upon withdrawal, a local congregation can withdraw from the parent organization without losing title to the local church property." 430 S.W.2d at 425.

The case had been appealed earlier, but had been remanded with instruction by the Supreme Court to admit into evidence any provision of the church's governing documents or law relevant to the issue. The Court of Appeals considered the minutes of the hierarchical church's General Assembly and the Digest, which was the governing document of The Cumberland Presbyterian Church. Based upon relevant documents, the court determined that when a congregation withdraws from the central church, there is a dissolution of the congregation, "with the result that title to property of the local church passes to the parent organization for the advancement of the purposes of the trust" established by church

governing documents. 430 S.W.2d at 429.

In explaining that the existence of the trust seems clearly indicated, the court stated that church members who contributed to the original purchase of the property and had it transferred to the local church as a Cumberland Presbyterian Church and those who contributed to improvements over the years "had every reason to expect their donations to remain under the government of the Cumberland Presbyterian Church." *Id.* The local congregation's withdrawal from the central church's governance was contrary to that expectation.

The United States Supreme Court has also recognized that the neutral principles approach can involve examination of religious documents such as a church constitution, specifically looking for language of a trust in favor of the central church. *Jones v. Wolf*, 443 U.S. at 604. *See also Maryland and Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. at 367-68 (affirming the lower court's decision in a dispute over church property between the central church and secessionist congregations where the court had relied upon, *inter alia*, language in the deeds conveying the property, the charters of the religious corporations, and provisions in the constitution of the central church pertinent to the ownership and control of church property).

St. Andrew's also contends that the absence of express trust language in the deed was the result of negotiations between the Diocese and the parish and is indicative of a "special relationship" between those entities. It also asserts that the trial court erred in its application of neutral principles of law because it did not acknowledge that St. Andrew's never agreed to a trust relationship with the Diocese or The Episcopal Church with regard to the Property.[14] St. Andrew's argues that Tennessee courts have traditionally analyzed the

---

[14] St. Andrew's argues that it never agreed to a trust relationship with the Diocese or The Episcopal Church with regard to the Property and should therefore be deemed the owner of the Property. First, evidence of St. Andrew's agreement is found in the church governing documents and in the fact that it remained a parish within the Diocese for many years after the Dennis Canon made the trust relationship abundantly and finally clear. St. Andrew's relies on two cases to support its argument *All Saints Parish Waccamaw v. Protestant Episcopal Church in the Diocese of South Carolina*, 685 S.E.2d 163 (S.C. 2009), and *Emmanuel Churches of Christ v. Foster*, 2001 WL 327910 (Tenn. Ct. App. Apr. 5, 2001). We find the first case to be so different from the situation before us as to be inapposite. We have already discussed the *Foster* case, which involved determining the intent of the original grantor of the property with regard to a dispute between two churches. This case is distinguishable from *Emmanuel Churches of Christ* for many reasons, most importantly because the Diocese rather than an individual conveyed the Property to St. Andrew's, and the canons in effect when the Property was conveyed indicated that all property held by a parish was held in trust subject to the Constitution and Canons of the Diocese and of The Episcopal Church. While the grantor's intent in *Emmanuel Churches of Christ* was that the property conveyed stay with the

(continued...)

-26-

attendant circumstances surrounding such property transfers or acquisitions, citing some of the cases discussed above, and that the trial court did not consider the negotiations.

We agree that attendant circumstances are to be considered, in the same way they are considered in all property disputes where the existence of a trust is claimed. The United States Supreme Court has said, "the neutral principles analysis shares the peculiar genius of private-law systems in general - flexibility in ordering private rights and obligations to reflect the intentions of the parties." *Jones v. Wolf*, 443 U.S. at 603-04. Generally, where there is a claim that property is held subject to a trust for the benefit of the grantor, the court's analysis focuses on the intent of the parties, particularly the grantor. *See, e.g.*, *Emmanuel Churches of Christ v. Foster*, 2001 WL 327910, at *3 (interpreting the intent of the grantor). Here, the grantor was the Diocese.

In the case before us, the attendant circumstances include things like St. Andrew's Articles of Association and church governing documents. There is nothing in the deed herein that would distinguish it from similar deeds in countless other cases. And, the canons of The Episcopal Church and the Diocese recognize that property may be titled in the name of a local parish. In its Articles of Association and Articles of Incorporation and its membership as a parish within the Diocese and The Episcopal Church, St. Andrews explicitly acknowledged and acceded to the constitution and canons of The Episcopal Church and the Diocese of Tennessee before the Diocese transferred the Property to it. St. Andrew's unequivocally stated that title to all real estate "shall be vested" in The Episcopal Church and the Diocese, and that all real property St. Andrew's acquires "shall be held, sold, transferred, alienated, conveyed, mortgaged or encumbered . . . only in conformity with the Constitution, Canons, Doctrine, Discipline, and Worship of the Protestant Episcopal Church in the Diocese of Tennessee."

St. Andrew's would have us ignore the clear language of these and other documents described earlier in this opinion. This we will not do. As the Supreme Court has stated, "Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. *Jones v. Wolf*, 443 U.S. at 603-04. Thus, the intent of the parties herein is established by the

---

[14](...continued)
trustees of the local church, the grantor's intent in this case was that the Property be held in trust for the Diocese.

governing documents, not just the deed.[15]

St. Andrew's also surmises that the trial court could have been persuaded by the Diocese's mischaracterization of the law regarding trusts on property in hierarchical churches. In fact, there a several cases in Tennessee that include language to the effect a trust exists in similar situations without express trust language. Such statements include, "property conveyed to a local church which is a part of a connectional[16] church does not remain the property of the local church even when there is no trust language in the deed." *Church of God in Christ v. Middle City Church of God in Christ*, 774 S.W.2d 950, 952 (Tenn. App. Ct. 1989) (citing *Cumberland Presbyterian Church v. North Red Bank Cumberland Presbyterian Church*, 430 S.W.2d 879 (Tenn. App. Ct. 1968) and *Hardin v. Starnes*, 221 S.W.2d 824 (1949)). The *Church of God in Christ* court further wrote, "when a local church acquires real property by deed, it is held in trust for the parent church even in the absence of express trust language." 774 S.W.2d at 952; *see The Holston Presbytery of the Presbyterian Church (U.S.A.) v. Wingard*, 1985 Tenn. App. LEXIS 3384, at *4-17 (Tenn. Ct. App. Jan. 9, 1985) (in property dispute between local church and national church with hierarchical relationship, court held local church holds property in trust for national church even though deed was silent on existence of trust). Additionally, The *Emmanuel Churches of Christ* court explained that "[a]s a general proposition, when property is conveyed to a local church having a connectional relationship to a central organization, the property belongs to the central organization." *Id*. at *2. However, the court explained, this general rule is subject to the "clear intent of the grantor in the deed manifesting a contrary purpose." *Id*. at *3.

In any event, we have found clear language in the church's governing documents that establish the clear intent of the grantor, the Diocese. Also, the governing church documents are not silent on the issue of a trust in favor of the Diocese or The Episcopal Church. The relevant language clearly creates a trust. Therefore, we think the application of the cases cited in the preceding paragraph is unnecessary.

We conclude the trial court properly applied the neutral principles approach by considering the warranty deed, St. Andrew's Articles of Association, St. Andrew's Articles

[15]St. Andrew's seems to believe that the absence of express trust language in the deed must be interpreted as an exception to the language in the governing documents that creates a trust over property held, used, or controlled by a parish. From the opposite view, one could argue that since church governing documents establish property ownership, any deviation from those governing principles would have to be explicit and in writing.

[16]The courts in Tennessee have used the term "connectional" to mean the same thing as "hierarchical."

of Incorporation, and the Constitution and Canons of The Episcopal Church and the Diocese to determine whether St. Andrew's holds the Property in trust for the Diocese. For the reasons stated by the trial court as well as those stated herein, we hold St. Andrew's holds the Property in trust for the Diocese, and the disassociating members of St. Andrew's are not entitled to claim any ownership interest in the Property.

## VIII. THE DIOCESE'S ACTION IS NOT TIME-BARRED

After the trial court issued its order granting the Diocese's motion for summary judgment, St. Andrew's filed a motion to alter or amend on the ground that the Diocese's cause of action is barred by the one-year statute of limitations set forth in the Tennessee Uniform Trust Code. St. Andrew's argued that since the Diocese's claim to the Property was based upon a trust created by provisions of church governing documents, the Diocese was required to bring this action within one year of St. Andrew's declaring its withdrawal from the Diocese of Tennessee in 2006. The trial court denied St. Andrew's motion, holding that the statute of limitations relied upon by St. Andrews had no application to the causes of action brought by plaintiffs. We agree.

Tennessee Code Annotated § 35-15-1005 provides in pertinent part:

(a) A beneficiary may not commence a proceeding against a trustee for breach of trust more than one (1) year after the date the beneficiary or a representative of the beneficiary was sent a report that adequately disclosed facts indicating the existence of a potential claim for breach of trust.

(b) A report adequately discloses facts indicating the existence of a potential claim for breach of trust if it provides sufficient information so that the beneficiary or the beneficiary's representative knows of the potential claim or has sufficient information to be presumed to know of it, or to be put on notice to inquire into its existence.

St. Andrew's argues that it announced its disaffiliation with the Diocese in 2006, and if the Diocese's position is correct that St. Andrew's holds the Property in trust for the Diocese, the Diocese was required to file its action against St. Andrew's, as trustee, within the following year, as set forth in the statute.

Contrary to St. Andrew's argument, the instant lawsuit is not a breach of trust action. This is a declaratory judgment action brought to have the courts determine the rights and

duties of the parties and, more specifically, to determine the ownership and control over the Property.  The answer to those questions depended on whether or not a trust existed.

While The Episcopal Church and the Diocese took the position that a trust existed in their favor, St. Andrew's disagreed and never acknowledged that it held or used the Property as trustee.  No "report" as envisioned by the statute was delivered; no allegation of breach of trust was made.  Instead, the parties disagreed about the interpretation and application of various documents regarding the ownership of the Property.

Since this declaratory action was to determine whether or not a trust exists, the statute of limitations applicable to actions alleging a breach of trust does not bar the Diocese's action.

## IX. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court in all respects. Court costs are taxed to The Rector, Wardens, and Vestrymen of St. Andrew's Parish, a Tennessee Corporation, for which execution shall issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE